**B. Calhoun HIPP, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Jean Jones HIPP, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. Nos. 2918, 2919.**

United States District Court
W. D. South Carolina,
Greenville Division.

Dec. 29, 1962.

Thomas K. Johnstone, Jr., and Andrew B. Marion, of Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., Randolph W. Thrower and William R. Patterson, of Sutherland, Asbill & Brennan, Atlanta, Ga., for plaintiffs.

John C. Williams, U. S. Atty., and Charles Porter, Asst. U. S. Atty., Greenville, S. C., Leon W. Vaseliades, Attorney, Tax Division, Dep. of Justice, Washington, D. C., for defendants.

MARTIN, Chief Judge.

These actions were brought by B. Calhoun Hipp and his wife, Jean Jones Hipp, to recover Federal Gift Taxes paid by them for the calendar year 1956 in the amount of $1,501.40 each.

The two cases were consolidated and tried by the Court on March 20, 1962. For the most part, the facts were stipulated, however, oral testimony was taken and certain documentary evidence introduced into evidence.

The cases concern the narrow question of the *value* of the income to a trust for a period of ten years.

On December 20, 1956, B. Calhoun Hipp executed a trust agreement by which he transferred 500 shares of the common capital stock of Liberty Life Insurance Company to The Greenville Branch of the South Carolina National Bank of Charleston, South Carolina, as Trustee. The trust agreement provided that for the period beginning December 20, 1956, and ending December 31, 1966, the net income from the trust be paid to unspecified charities, and upon the expiration of that period the trust corpus be distributed to the children of the taxpayers. The agreement vests in the trustee unlimited discretionary powers to sell the trust assets and to invest the proceeds from such sale in other assets. The trust agreement encompasses two gifts. The gift of the income from the trust for a ten-year period is given to charity and the corpus is given to the taxpayers' children to be paid at the end of the term. For Federal Gift Tax purposes, the gift is considered as made one-half by B. Calhoun Hipp and one-half by his wife, Jean Jones Hipp. A taxpayer is entitled to deduct gifts to charities from the total gifts he makes during any one year.[1]

Each taxpayer filed a timely Federal Gift Tax Return for the year 1956, reporting the gift in trust. On the returns, the taxpayers assigned a market value of

---

1. Treasury Regulations Sec. 25.2522(a)–1 Charitable and similar gifts; Citizens or residents * * *

"(a) In determining the amount of taxable gifts for the calendar year there may be deducted, in the case of a donor who was a citizen or resident of the United States at the time the gifts were made, all gifts included in the 'total amount of gifts' made by the donor during the taxable year. * * * and made to or for the use of:

"(2) Any corporation, trust, community chest fund or foundation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals * * *"

$150 per share to the Liberty Life stock or an aggregate value of $75,000 for the 500 shares, then deducted from this amount the purported value of the ten years' income interest given to charity. The taxpayers computed the value of the income interest in accordance with the method prescribed by Treasury Regulations, Section 25.2512–5. The method so prescribed is to multiply the market value of the shares of stock by the factor set forth in Column 3, Table II, Treasury Regulation Section 25.2512–5. This computation resulted in an assigned value of $21,831.08 (75,000 × .291081 [factor for ten year term prescribed in Column 3 of the Table]).

Upon audit of the returns, the Commissioner of Internal Revenue determined that the market value of the stock at the date of the gift was $159 per share. Pursuant to this determination, the Commissioner assessed deficiencies [2] in gift tax against each of the taxpayers and on September 8, 1958, the taxpayers each paid the additional gift tax in the amount of $237.10, plus interest. Subsequently, on April 15, 1960, the day on which the statute of limitations against assessment of additional gift tax against the plaintiffs for the year of the gift would otherwise expire, the Commissioner sent to each of the taxpayers a statutory notice of deficiency proposing a further deficiency in Federal Gift taxes for the year 1956 in the amount of $1,251.58. On August 26, 1960, the taxpayers paid this second deficiency, plus interest, in the amount of $249.82.

The basis for this second deficiency determination was explained in the notices to the taxpayers which read:

"Factor .291081 for the value of a term certain for ten years (.291081 × value of corpus) does not apply because this factor is based on a return of 3½% whereas the expected return

on this gift of $1.00 per share is considerably less than a return of 3½%."

The method substituted by the Commissioner was to treat the gift to charity as an annuity of a fixed and definite dollar amount equal to the annual cash dividend being paid on Liberty Life Insurance Company common stock at the date of the gift. This method assumed income to the trust of $1.00 per share for ten years discounted by 3½% compounded annually. The computation of the value is as follows: 500 × 1.00 = $500 × 8.3166 [3] = $4,158.30.

Claims for refund of the second deficiency assessments were filed with the District Director of Internal Revenue for the District of South Carolina on September 22, 1960. On December 27, 1960, the District Director formally rejected each of the claims for refund and these actions followed.

At the time the trust agreement was executed B. Calhoun Hipp was a director and the Administrative Vice-President of Liberty Life and held 15.1% of the outstanding shares of common stock of the company. The other major stockholders of the company are two brothers of B. Calhoun Hipp and a sister. Collectively, the Hipps control more than fifty per cent of the voting stock of the company.

The value of most gifts are determined by their market value. Market value is defined by Treasury Regulation Section 25.2512–1 as:

"The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. * * * "

This approach cannot be used, however, when the property to be valued is

---

2. In computing the deficiencies the Commissioners used the method of valuing the gift to charity as used by the taxpayers which was the method prescribed by the regulations.

3. The factor was obtained from Column 2 of Table II of the Regulation.

not purchased and sold on the market. In such cases the value is determined by methods prescribed by the Treasury Regulations.[4]

The problem before the Court is to determine whether the value of the income interest is determined by the regulation or whether the regulation does not apply and some other formula should be used. The Government argues that the regulation is not applicable on the ground that the table is designed for use where there is an absence of facts and that there are facts in the present case which establish the value of the income interest. If the actual value of the income interest can be determined with any degree of certainty, the method of valuation prescribed by the regulation is not applicable.

The Government argues that during the period from 1952 through 1956, 500 shares of Liberty Life stock produced $500 per year in earnings and that as of the date of the gift this earning record was expected to continue during the next ten years. If we assume that 500 shares of stock were placed in a trust in 1952, the yield produced is as follows:

1952 — $1,000.00
1953 —  "    "
1954 —  "    "
1955 —  "    "
1956 —  "    "

This increase in dividends was caused by a 100% stock dividend in March 1952 so that the imaginary trust would have held 1,000 shares of stock after the dividend date and the income to the trust would have been $5,000.00. Percentage wise, upon an initial investment of $49,500.00 [5] the yield would have been 2%. The Government contends that the percentage of yield would have been .62% but this computation is based only on the cash dividends and does not take into account the increase in income by reason of the increase in the number of shares held by the trust during the period.

The Government also argues that the use of the regulation would be unreasonable in this particular case on the ground that the taxpayers must show the probable yield per share as of 1956 was 3½%. Further, it is argued that the highest yield in the preceding ten-year period was $2.45, 56% less than the $5.56 average required. This argument encompasses a comparison of uncomparables. It compares an average dividend of $2.45, during a period when the fair market value of the stock at the beginning of the period was $42.00 with an average assumed dividend of $5.56 during a period when the fair market value of the stock was $159. When the two amounts are reduced to comparables, i. e. percentages, a different picture is presented. During

4.    § 25.2512–5 Treasury Regulation
"Valuation of annuities, life estates, terms for years, remainders and reversions. (a) In general. (1) The fair market value of annuities, life estates, terms for years, remainders and reversions is their present value, determined under this section, except in the case of annuities and life insurance under contracts issued by companies regularly engaged in their sale. * * *"

"(2) The present value of an annuity, term for years, remainder or reversion dependent on a term certain is computed by the use of Table II in paragraph (f). * * *"

* * *

"(f) * * * Table II

(Table showing the present worth at 3½ percent of an annuity for a term certain, of an income interest for a term certain, and a remainder interest for a term certain, and of a remainder interest postponed for a term certain)

| (1) Number of years | (2) Annuity | (3) Term Certain | (4) Remainder |
|---|---|---|---|
| | | * * * | |
| 10 | 8.3166 | .291081" | |

5.    The market value of the stock on January 1, 1952, was $99.00.

the period from 1944 to 1953, although the average yield was only $2.45 per year, the percentage yield based on the fair market value at the beginning of the period was 5.83% [6] as compared with 3½% which is taken from the table. Then too, the Government's computation does not take into account the stock dividends paid in 1944, 1947 and in 1952.

■ It is well settled that the determination of the Commissioner is presumptively correct and such determination is binding upon the Court if it is supported by substantial evidence but where the method pursued by the Commissioner is erroneous, the presumption of the correctness of the determination no longer avails. Clinton Cotton Mills v. Commissioner of Internal Revenue (4th Cir., 1935), 78 F.2d 292:

In the present case it is obvious that the Commissioner's determination in computing the second deficiency against the taxpayers did not take into account the actual earnings of Liberty Life stock during the four-year period upon which it based the projected earnings of the trust during the period the trust was to produce income for the benefit of charities. As explained above, the Government erroneously assumed that one share of Liberty Life stock produced $1.00 in income per year during the four-year period which served as the base period for projecting the expected income, and did not take into account the fact that in the first year of the base period, the company declared a 100% stock dividend so that during the period an imaginary trust would have earned $2.00 on each share which it held at the outset of the period. This erroneous approach by the Commissioner destroys whatever presumption his determination would ordinarily carry.

The valuation of future interest is at best a highly speculative undertaking not unlike the determination of life expectancy which courts and juries are called upon to make in almost all personal injury actions. Recognizing that the value of future interest cannot be determined with any degree of certainty, those called upon to make valuations have resorted to established computations which seldom accurately predict the value in a particular situation but prove to be accurate when used in a great number of instances. In McMurtry v. Commissioner (1st Cir., 1953), 203 F.2d 659, where the Government successfully opposed the taxpayer's effort to depart from the regulations, Chief Judge Magruder stated:

"  *   *   * The whole problem of valuing individual life interests by resort to mortality tables is at best a matter of educated guesswork. The courts cannot demand perfection in an area so fraught with speculation and uncertainty   *   *   *" page 666.

In Gelb v. Commissioner (2d Cir., 1962), 298 F.2d 544, the Court said:

"Yet the use of actuarial tables for dealing with estate tax problems has been so widespread and of such long standing that we cannot assume Congress would have balked at it here; the United States is in business with enough different taxpayers so that the law of averages has ample opportunity to work." page 551.

In Bowden v. Commissioner (5th Cir., 1956), 234 F.2d 937, the Court quoted with approval the following language from McMurtry v. Commissioner:

"We think, therefore, that tables which have enjoyed such widespread and long-standing use should not be rejected as wholly unreasonable, even though they may perhaps be susceptible of minor improvements in particular respects. Such discrepancies as may exist will no doubt average out in the long run; and while this may sometimes prove to be unfortunate for individual taxpayers, the discrepancies may have to be suffered in the interest of a simpli-

6. $2.45 divided by $42.00.

fied overall administration of the tax laws." page 941.

The Government argues, and the taxpayers concede, that where the facts show that a valuation can be made in a particular case with exactitude, the tables should not be used. In the present case, however, the valuation of the gift cannot be determined with any degree of certainty. Certainly it would be incorrect to say that each share of stock will produce $1.00 in income during the period of the trust. It may well be that the income will prove to be less than the return anticipated by the regulation but the Court cannot establish the value of the income interest.

A brief résumé of the history of Liberty Life will show how difficult it is to determine income from its common stock during the period of the trust.

On January 1, 1941, Liberty Life Insurance Company had issued an outstanding 40,000 shares of its common capital stock. By reason of stock dividends paid in November 1942, October 1944, October 1947 and March 1952, the number of shares outstanding on the date of the gift had increased to 200,000 shares. Each time the company paid a stock dividend it maintained essentially the same cash dividend rate per share, with the result that issuance of stock dividends caused increases in cash dividends paid to the shareholders.

Since 1939, when the capital stock of Liberty Life was first offered to the public, the company had consistently paid regular cash dividends. The amount of the cash dividends had substantially increased over the years prior to 1956.

On December 20, 1956, Liberty Life Insurance Company had behind it a record of continuing growth and prosperity. During the period 1941–1956 its net investment profit, net earnings, book value, insurance in force, and total assets, had all increased by more than 1000%. On the date of the gift, shares of outstanding stock were held by 892 shareholders; there was something over $817,649,814.00 of insurance in force; and the total assets of the company were in excess of $92,284,068.45. On the date of the gift, there was reason to believe that the company would continue to enjoy rapid growth and expansion.

In every ten-year period in the history of Liberty Life, prior to the date of the gift, the amount of cash dividends paid to stockholders had significantly increased. The average annual cash dividends paid to stockholders of Liberty Life during the seven ten-year periods, commencing with the period 1941–1950, and ending with the period 1947–1956, expressed as a percentage of the fair market value of the stock at the beginning of each period, ranged from a high of 7.18% to a low of 2.47% and averaged 4.51% for all such periods.

The management and board of directors of the company, and the investing public, anticipated at December 20, 1956, that cash dividend payments by the company would be increased substantially during the ten-year period subsequent to December 20, 1956. The management and board of directors anticipated that, in addition, there would be in early 1957, an increase in cash dividends. Taxpayers' witnesses testified, that it was not unreasonable to forecast an average annual return of 3½% on Liberty Life stock during the period the trust was to exist. Mr. Charles D. Behrens, Executive Vice-President and a Director of Moody's Investors Service who gave testimony during the trial, testified that he had made a careful study of Liberty Life and based on his knowledge and experience a return of 3½% on Liberty Life stock during the period of the trust would be within the range which could be expected.

The Government relies on Hamm v. Commissioner (1961 P-H T.C. Memorandum Decision, par. 61347) (P. 2012) (1961). In that case Mr. Hamm executed on July 1953, two written trust agreements by which he designated himself to be the sole trustee and providing that the income interest accruing to each trust should be paid to the Hamm Foundation, a charitable organization, until March 1, 1964. In December 1953, petitioner exe-

cuted a first addendum to each trust, by which he made gifts of the stock of United Properties Inc., a family investment and holding corporation to each of the trusts. By such addendums, petitioner transferred 130 shares to Trust I and 133⅓ shares to Trust No. II.

One of the questions presented in the case was whether the petitioner was entitled to a charitable deduction for the gifts of income to be derived from the shares of United to the Trusts. The Court held that at the time of the gifts it was improbable that the charity, (Hamm Foundation) would ever derive any net income in respect to the gifts involved. The Court said:

"It would not be proper in our opinion, in the circumstances of the instant case, to value the 10-year income interest of the Hamm Foundation through use of the table contained in the respondent's Gift Tax Regulations, which is provided for use in valuing certain estates for life or for terms of years. In the instant case, as above shown, there was no probability that charity would ever take anything; and hence it would be wholly unrealistic to apply the table here. Said table assumes an annual yield of 3½ percent; but in the instant case, any yield whatsoever on United's common stock was wholly improbable, and likely to be nil. * * * This Court has held that where the probable yield is either significantly greater, or significantly less than the yield assumed in the table, then regard should be had to the actualities of the particular case, rather than to the assumption built into the table." (citation of authority omitted) n. 16

The facts in the Hamm case places it squarely in the exception set forth by Section 25.2522(b) of the Regulation which provides:

" * * * The deduction is not allowed in the case of a transfer in trust conveying to charity a present interest in income if by reason of all the conditions and circumstances surrounding the transfer it appears that the charity may not receive the beneficial enjoyment of the interest. For example, assume that assets placed in a trust by the donor consists of stock in a corporation, the fiscal policies of which are controlled by the donor and his family, that the trustees and remaindermen are likewise members of the donor's family, and that the governing instrument contains no adequate guarantee of the requisite income to the charitable organization. Under such circumstances, no deduction will be allowed. Similarly, if the trustees are not the donor's family but have no power to sell or otherwise dispose of closely held stock, or otherwise insure the requisite enjoyment of income to the charitable organization, no deduction will be allowed."

There is no contention by the Government that the exception applies to the present case.

The facts in the Hamm case are far different from those before the Court in the present actions. In the Hamm case, the circumstances affecting the Corporation, United, made it unlikely that there would be any payment of dividends at all to the trusts. The trustee to whom the dividends were to be paid was an officer of the corporation. Here, there is every reason to believe that the dividends from Liberty Life stock will be available for gifts to charity.

After a careful study of the evidence presented in the case relating to the income possibilities of Liberty Life stock and the power conferred upon the trustee to sell the corpus assets and reinvest the proceeds in other assets, the Court is convinced that any valuation of the income interest would be little better than a guess. In such a case it is clear that the method prescribed by the regulation should be used.

## ORDER

Judgment will be entered in favor of the plaintiff in each action in the amount of One Thousand, Five Hundred One and 40/100 ($1,501.40) Dollars.

IT IS SO ORDERED.