Chauncey Stillman v. Commissioner.
Stillman v. Commissioner
Docket No. 90320.
United States Tax Court
T.C. Memo 1965-94; 1965 Tax Ct. Memo LEXIS 236; 24 T.C.M. (CCH) 478; T.C.M. (RIA) 65094; April 12, 1965
*236 Petitioner transferred, by gift to a trust for his children, a contingent remainder interest in a trust created under the will of his grandfather, of which his sister was the life beneficiary. Held: Value on gift date of contingent remainder determined under section 25.2512-5(e), Gift Tax Regulations. Estate of Nellie H. Jennings, 10 T.C. 323, 327, distinguished. *237 Francis S. Bensel, and Hewitt A. Conway, 70 Broadway, New York, N. Y., for the petitioner. Philip Shurman, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in gift tax for 1956 in the amount of $926,660.43, and for 1957 in the amount of $53,179.57. Only the gift tax for 1956 is in dispute; the amount of the 1957 tax depends upon the amount of the tax for 1956. The question is the determination of the value, on the date of the transfer, of the contingent remainder interest of petitioner in a testamentary trust created under the will of his grandfather. Findings of Fact The stipulated facts are found as stipulated; the stipulations of facts are incorporated *238 herein by this reference. Petitioner's gift tax returns for 1956 and 1957 were filed with the district director of internal revenue, Lower Manhattan District, New York City. Petitioner is a resident of New York City, and of Amenia, New York, which is 23 miles northeast of Poughkeepsie, close to Connecticut. Under circumstances described later, on September 17, 1956, petitioner transferred to an irrevocable trust, which he created on that date for the benefit of his two daughters, $1,000 in cash, and all of the interest he then had in a testamentary trust created under Article Eighth of the will of James Stillman, his grandfather. His sister, Elizabeth Stillman Williams, was the life beneficiary of the income of the testamentary trust. On September 17, 1956, petitioner's interest in the James Stillman trust, hereinafter called the testamentary trust, was a special type of future interest; it was a contingent remainder interest in the trust property; it was a contingent remainder interest involving 2 lives, i.e., a remainder interest that would "fall in" upon the death of a specified person (Elizabeth) provided another specified person (petitioner) survived, as is explained later. *239 It is stipulated that on September 17, 1956, the corpus of the testamentary trust had a fair market value of $3,727,230.80. Petitioner's grandfather, James Stillman, died testate on March 15, 1918. James Stillman had 3 sons, Charles Chauncey Stillman, petitioner's father, James A. Stillman, and Ernest G. Stillman. Charles Chauncey Stillman died on August 16, 1926. Petitioner and his sister were the only living children of Charles Chauncey Stillman on September 17, 1956. The two children of the petitioner are Elizabeth Jay Stillman, born August 2, 1944, and Mary Theodora Stillman, born December 15, 1945. Elizabeth Stillman Williams was born on October 27, 1905. She did not have any children as of September 17, 1956, or thereafter. Petitioner was born on November 9, 1907. The only living, lineal descendants of Charles Chauncey Stillman on September 17, 1956, were Elizabeth Stillman Williams (hereinafter called Elizabeth), Chauncey Stillman, petitioner, and the 2 daughters of Chauncey Stillman. Article Eighth of the James Stillman will is incorporated herein by reference. The pertinent provisions thereof, summarized, provide as follows: In his will, James Stillman directed *240 that part of his estate should be held in trust for the benefit of his son, Charles Chauncey Stillman, or the lineal descendants of Charles. Charles was the income beneficiary of this trust during his lifetime and upon his death the corpus of the trust then being administered for his benefit was divided into as many equal shares as there were surviving children or lineal descendants of Charles, and each share was held in trust. Thus, on August 16, 1926, the trust for the benefit of Elizabeth came into existence under Article Eighth. Elizabeth was to receive the income of this trust for life. This is the trust which is involved in this case. Under Article Eighth, the testamentary trust was to terminate upon the death of Elizabeth and the principal was to be paid over to her then surviving lineal descendants in equal shares, if any; or if none, to the other lineal descendants of Charles, in equal shares per stirpes and not per capita; or if there were no such lineal descendants surviving, to the other sons of James Stillman, James A. and Ernest G., or the survivor of them, or to the lineal descendants of either of them, in equal shares per stirpes. Since on September 17, 1956, the *241 only living, lineal descendants of Charles were Elizabeth, Chauncey, and the 2 daughters of Chauncey, the corpus of the testamentary trust would be distributed upon the death of Elizabeth in the following sequence: (1) To the surviving descendants of Elizabeth, if any. (2) If none, to Elizabeth's brother, Chauncey, if he was living. (3) If Chauncey was not living, then to the surviving children of Chauncey, or to the survivor of them. (4) If none, then to the surviving lineal descendants of either James A. or Ernest G. Stillman. If petitioner died before Elizabeth, leaving a surviving child or children, his child or children would receive the corpus of the testamentary trust as the heir or heirs of their great-grandfather, James Stillman, under Article Eighth of his will, and petitioner's remainder interest would not vest in the possession of the trustee of the new trust created on September 17, 1956, because petitioner's transfer on that date was a transfer of a future interest which would not vest in the possession of petitioner or the trustee of his trust, except upon the fulfillment of the conditions provided in Article Eighth, and unless those conditions were met, the trustee *242 of the new trust created by the petitioner would not receive anything under petitioner's transfer, except the $1,000. The provisions of the new trust agreement executed by petitioner on September 17, 1956, are incorporated herein by reference. This agreement contains provisions relating to the contingency that petitioner's future interest in the corpus of the testamentary trust might never vest in the possession of the trustee. Thus, the trust initially was set up to be a simple caretaker trust holding $1,000 in cash and a nonproductive, contingent asset - the remainder interest. To provide for the contingency, it is provided that "in the event that the remainder interest of the Grantor in the trust held under Article Eighth of the Will of James Stillman, deceased, * * * for the benefit of Elizabeth Stillman Williams for life shall not vest in the possession of the Trustee upon the death of Elizabeth Stillman Williams, the Trustee may terminate the trust hereby created at any time after the death of Elizabeth Stillman Williams by delivering the principle [$1,000] and income of the trust estate to the persons entitled to receive the income [Chauncey's children] * * *." This provision *243 was to relieve the trustee of the duty of administering a trust having as its only asset $1,000. The trust agreement also provided, in the alternative, for the possibility that the remainder interest in the testamentary trust would vest in possession of the trustee, in which event additional trustees would be appointed, including a corporate trustee, and those trustees are given the usual, extensive powers commensurate with the size of the fund or property which would come into their care. The initial trustee appointed was Louis B. Warren, petitioner's attorney. The circumstances under which petitioner created a trust and transferred his remainder interest were as follows: In the summer of 1956, petitioner's attorneys of their own accord, Louis B. Warren and Hewitt A. Conway, made a detailed review of petitioner's estate matters. Conway gave consideration, inter alia, to petitioner's contingent remainder interest in the testamentary trust, to possible alternative events, and to the New York State and Federal estate taxes which would be involved if the corpus of the testamentary trust should be distributed to him, the value of which was $3,804,626 on December 31, 1955, and he died *244 possessed thereof. Conway concluded that the estate taxes on the property received from the testamentary trust would amount to $3,081,747, close to the value of that property, leaving an estimated $722,879 for petitioner's heirs under his will. Conway also considered what would be involved if petitioner made an intervivos transfer of the contingent remainder and what the gift tax would amount to as compared to the estate taxes. He had before him a new publication of the Internal Revenue Service, which was first made available to the public in the spring of 1955, entitled "Actuarial Values For Estate and Gift Tax," IRS Publication No. 11 (exhibit 3). Before the release of this pamphlet, it was necessary to make a request to the Commissioner for the special mathematical factor to be used in computing the present value of a special future interest not covered by the regulations, but which would be provided only in the case of a completed gift. [1] Example 7, p. 11 of IRS Publication No. 11, provides the special factor and method for determining the present value of a "contingent joint life" remainder, involving 2 lives; i.e., an interest dependent upon more than one life. The remainder *245 interest in the testamentary trust created under the will of James Stillman was a contingent remainder involving 2 lives. Using Example 7 in the pamphlet, Conway computed the present value of petitioner's remainder interest (on the basis of the value of the trust corpus on December 31, 1955), for gift tax purposes as $1,197,696.26, and the amount of the gift tax, $320,326.86. The computations of estate tax and gift tax, respectively, under the alternatives, were made by Conway and considered by Warren in order to enable them to arrive at a judgment as to the advisability of petitioner's either retaining the remainder and awaiting the happening of contingencies, or of making an inter vivos gift thereof, and the purpose of arriving at such judgment *246 was to advise their client. Conway put the results of his analysis into the form of a memorandum dated August 1, 1956 (exhibit 4). Warren decided to discuss the analysis with petitioner, and it was Warren's idea that petitioner might give consideration to creating a trust for the benefit of his daughters and making an inter vivos transfer of the remainder to the trust. Petitioner first heard about the proposed new trust from Warren, and that was early in August 1956. Warren sent him a letter dated August 2, 1956, enclosing Conway's memorandum. Both are incorporated herein by reference (exhibit 4). Warren's letter stated that the enclosed memorandum "presents some very striking possibilities with regard to taxation that I would like to discuss with you on our cruise [on petitioner's boat]." Conway's memorandum set forth the points mentioned above, namely, that under the terms of the James Stillman trust for Elizabeth, the corpus thereof would be paid to petitioner, if he survived Elizabeth, or to his two children, if he died before Elizabeth; that if petitioner survived Elizabeth, the corpus of the trust would be included in petitioner's gross estate for Federal and New York *247 estate tax, unless petitioner transferred his interest in the trust more than 3 years prior to his death; that the estate tax payable thereon would total $3,081,747; that the cost of making an inter vivos transfer of the trust property if it vested in petitioner would be $1,326,550; and that, on the other hand, if petitioner predeceased his sister, petitioner's two children would receive the corpus of the trust as heirs, free of any tax. The memorandum concluded by making the following recommendations: To insure against the possibility that Mrs. Williams will not survive Mr. Stillman, I suggest that Mr. Stillman consider transferring his remainder interest in the trust for Mrs. Williams into a new trust for the benefit of his two children during their lives with remainder to their descendants or with a power in the children to appoint among Mr. Stillman's descendants. The gift tax payable upon such a transfer would be $320,326. Because this gift tax would be removed from Mr. Stillman's estate, the actual cost to Mr. Stillman's descendants would be only $60,862. In my judgment, $61,000 is a very small price to pay to insure that Mr. Stillman's descendants receive $3,800,000 rather *248 than $723,000. Between August 15 and 23, 1956, Warren conferred with petitioner, on petitioner's boat during a cruise, about the subject matter of Conway's memorandum. Warren discussed with petitioner the possibility that petitioner might die before his sister; that in such event his daughters would receive the property in the testamentary trust under Article Eighth of their great-grandfather's will as his heirs and no tax would be involved; and that if petitioner created a trust and made an inter vivos gift of the remainder to it, he would be taking the risk of paying a gift tax of about $300,000 for which neither petitioner nor his estate would receive any benefit, because if he died before his sister, in fact he would not have transferred an interest to the new trust, but in fact would have transferred nothing. However, Warren recommended to petitioner that he assign his remainder interest to a trust, as recommended in the memorandum. In making such recommendation, Warren relied on the Gift Tax Regulations of the Commissioner, with which he was familiar. Petitioner told Warren to go ahead with the preparation of a trust agreement. Warren thereafter prepared drafts and submitted *249 them to petitioner. On September 17, 1956, petitioner executed the previously described trust agreement by and in which he transferred to the trustee, receipt of which was acknowledged by the trustee, $1,000 in cash, and all of his interest in the testamentary trust. Petitioner's sister, Elizabeth, was on a trip to England and Ireland, with her husband, Langbourne M. Williams, from August 1 to 28, 1956, during which trip she attended the Dublin Horse Show, visited various places in Ireland and England, followed the strenuous activities of a traveler, and traveled by boat, automobile, and airplane. With her husband, she took motor trips, went to dinners and theatres, and pursued a normal schedule. Earlier in 1956, she took another trip to Cuba with her husband, from March 2 to 15, 1956. He was chairman of the board of directors of the Freeport Sulphur Company which had a nickel property in Cuba, which was the reason for the trip, which was a business trip to Havana and Santiago. Prior to the year 1956, and prior to September 17, 1956, and close to that date, before it and after, Elizabeth led a normal, active life, and engaged in certain sports, such as swimming, tennis, and golf. *250 She carried on various civic and charitable activities, looked after her investments, and was a member of various boards and committees, referred to hereinafter. With her husband, Elizabeth had an apartment in New York, City, where they lived during the late autumn and winter, and a home in Cornwall, which is on the Hudson River north of Newburgh and northwest of New York City. They also had a home in Rapidan, Virginia, and a ranch in Wyoming. Elizabeth led a normal and active domestic and social life. After Elizabeth returned from the trip abroad on August 28, 1956, the petitioner had visits with her at her home in Cornwall and at his home in Amenia. During the 1956 Labor Day weekend, petitioner and his 2 daughters stayed overnight at Elizabeth's home in Cornwall. During that weekend, Elizabeth also had several other house guests, friends, and their children; and she went swimming, took snapshots, and went with her house guests for a spin on the Hudson River on petitioner's boat, where they had supper aboard. A photograph was taken of Elizabeth and others on the boat; she wore casual sports attire (shorts and blouse), was doing some needlework, and apparently was enjoying the *251 trip. There was a great deal of activity during the weekend, in which Elizabeth participated. On September 14, 1956, Elizabeth drove her car from her home in Cornwall to petitioner's home in Amenia, 60 miles, and from Amenia 23 miles southwest to Poughkeepsie, where she attended a meeting of the board of trustees of Vassar College. She had lunch with petitioner and his daughters, took a photograph of a portrait of her great-grandmother, took snapshots, and went about the garden. After lunch she drove on to Poughkeepsie. She went in her automobile from Cornwall to Poughkeepsie in the middle of October to attend another board meeting at Vassar. The following relates to Elizabeth's activities in 1956, prior to and around the time of September 17, 1956, before and close to that date, and also describes them during the 3 or 4 years prior to 1956: On September 17, 1956, prior thereto in 1956, and close to that date thereafter, Elizabeth's activities were not restricted. She led a busy and active life. Her pattern of activities included the following: She entertained; attended social gatherings, the theatre, and meetings; served on committees and boards; and took a financial and participating *252 interest in charitable, hospital, and educational organizations. She looked after her financial interests and investments, which were extensive, and for those purposes she had an office at 230 Park Avenue and employed a secretary who worked at the office, Alice P. Grauer, who was her secretary for 21 years. She was a co-trustee of a trust, with Louis B. Warren, created under the will of James Stillman. The trustees met every month, except in the summer, and Elizabeth took an active part and was extremely well informed. She also met with Warren frequently to discuss her own investments and business interests. She looked after grazing and mineral rights problems which developed at her Wyoming ranch. She was treasurer of the Bellevue Hospital School of Nursing, attended meetings there, and took an interest in the administration of the School of Nursing. She also was a trustee of the Children's Aid Society of New York City and took an active interest in the homemaker service and recreational program throughout the city. She was an active member of the executive committee of the board of trustees of Vassar and attended its meetings, as noted above; and she took an active interest in other *253 organizations to which she made financial contributions. She did not buy tickets for a benefit or a series of concerts unless she intended to attend; if she was not going to attend, she sent a contribution instead of subscribing for tickets. Thus, on the following dates she subscribed for tickets to benefits and series of events with the intent of attending all: Date of
Purchase
Dates of
of Tickets
Events
Events
July 23, 1956
Benefit
Dec. 18, 1956
Sept. 21, 1956
Benefit Children's
Aid Society
Dec. 11, 1956
Oct. 23, 1956
Foreign Policy
Ass'n
Nov. &
Luncheons to be
Dec. 1956
held
Jan., Feb.,
Mar. 1957 On October 30, 1956, she reviewed with her secretary the contributions that she customarily made at Christmas, and the total amount of additional, deductible contributions that could be made in 1956 within the total amount of deductions allowable with respect to her 1956 income; she wrote in her own handwriting the letters to be sent with each contribution in explanation thereof; and she also discussed with her secretary a schedule of contributions which she intended to make in 1957. The above facts about Elizabeth's activities *254 and pattern of life (which are descriptive of them during years prior to 1956 and during 1956 up to, including, and soon after September 17, 1956, the gift date) are indicative of her health and general condition of health. She was leading an active life and did not appear to be ill. Her activities were not restricted. She was not an invalid. The above facts about her activities and pattern of life, during the periods of time stated above, also are indicative of the knowledge, understanding, and beliefs, about her health and general condition of health, of pettioner and his attorneys, as well as Alice P. Grauer, at the time petitioner was considering whether or not to create a trust and make an inter vivos transfer to it of his contingent remainder interest in the testamentary trust, and on September 17, 1956, when he made the transfer. Ultimate Findings of Fact 1. At no time prior to and including September 17, 1956, did either Warren or Grauer have any knowledge, belief, or suspicion that there was anything different in Elizabeth's health and condition of health than it had been prior thereto. They believe that Elizabeth was an essentially well person. 2. At not time prior *255 to and including September 17, 1956, and as of the latter part of September and thereafter, did petitioner have any knowledge, belief, or suspicion that there was anything different in Elizabeth's health and general condition of health than it had been in years prior to 1956 and during 1956 up to and including September 17, 1956. Petitioner believed that Elizabeth was an essentially well person on, prior to, and after September 17, 1956. 3. In deciding whether or not to make the transfer in trust of the contingent remainder, petitioner acted in good faith and he considered that he was taking the risk that in fact he would transfer nothing due to the contingency that he might predecease his sister, in which event he would have paid a gift tax of around $300,000 for which neither be nor his estate would receive any benefit. 4. In deciding whether or not to make the transfer in trust of the contingent remainder, and in making it on September 17, 1956, petitioner and his attorneys relied upon the provisions of the Gift Tax Regulations prescribing that the fair market value of a remainder interest which has been transferred must be determined by the use of factors derived from Table *256 38 of the United States Life Table and Actuarial Tables 1939-41, and interest at the rate of 3 1/2 percent per year compounded annually; in effect, section 25.2512-5(e). Respondent's determinations of value and the deficiency in gift tax were made under the following circumstances: In the early part of 1959, John Chambers, revenue agent and lawyer in the estate and gift tax division of the Internal Revenue Service in New York City, received the assignment of examining the 1956 gift tax return of petitioner. He noticed on the return the name of the life tenant of the testamentary trust in which petitioner formerly had a remainder interest, and he made a search to find out whether the life tenant of the testamentary trust had died; that is, whether an estate tax return had been filed in her name. Chambers did find that an estate tax return had been filed, and that Elizabeth had died on November 26, 1956. On the estate tax return it was stated that the attending physician was Dr. Alice T. Baker in New York City; that the length of the last illness was about one month; and that the executors were Langbourne M. Williams and Louis B. Warren. Chambers made a thorough investigation into *257 Elizabeth's confidential medical records for the 3 years 1954, 1955, and 1956, and made inquiries of doctors. He used the subpoenas and summons of an internal revenue agent (authorized by sections 3614 and 3633 of the 1939 Code and section 7602 of the 1954 Code) to obtain the medical records and information, and had letters of inquiry sent by the district director of internal revenue in New York City. A letter dated March 27, 1959, was sent by the district director to Dr. Baker which stated that the inquiry was being made in "connection with the verification of the estate tax return," and that the information given would be treated confidentially. In this letter, among other things, Dr. Baker was asked what her diagnosis had been of the decedent's condition "with a view of her expectancy of life," and what her records showed about the history of the case. Dr. Baker gave medical information about Elizabeth to Chambers. She was aware of the concept of the confidential relationship between a doctor and patient, but she believed that she was nevertheless obliged to give information to a representative of the Federal government under an exception of some sort to the rule that the doctor-patient *258 relationship is confidential. Also, other doctors who had been consulted by Elizabeth gave information to Chambers about Elizabeth's medical record. On the other hand, when Chambers contacted Warren and asked for medical records of Elizabeth, Warren refused to allow Chambers to have access to them, but this refusal had no effect; Chambers obtained most, if not all, of the medical records which he sought. Conway contacted Chambers and told him that a visit of Chambers with Dr. Baker had been made without the attorneys' permission, and that at any future meeting with Dr. Baker, either Conway or Warren wished to be present. Chambers ignored this request and again saw Dr. Baker, on June 12, 1959, without asking the attorneys to be present, and neither one was present at this meeting. At the meeting on June 12, 1959, Chambers handed Dr. Baker an administrative summons directing her to appear on June 22, 1959, before him at the district director's office and to produce all of her records for 1954, 1955, and 1956 relating to the health condition and diagnosis thereof in the case of her patient, Elizabeth. In this summons, it was stated that the inquiry related to the gift tax liability for *259 1956 of Chauncey Stillman. On July 17, 1959, Warren and Conway had a meeting at Chambers' office with him and another agent, John Murphy. Prior to this meeting, Warren was informed that Chambers had obtained by administrative subpoenas and had in his possession copies of the medical records of Elizabeth and had obtained considerable information about her medical history. The contents of these medical records were the subject of the discussion at the conference on July 17, and at a subsequent conference on October 29, 1959, which Conway also attended. Warren, as attorney for Chauncey Stillman, engaged the services of an expert, Dr. Paul Reznikoff, and took him to the two conferences for the purpose of clarifying certain facts and certain opinions of Chambers, which Warren and Dr. Reznikoff believed were incorrect. Chambers previously had solicited and obtained information about the medical record of Elizabeth under a letter from Dr. Reznikoff dated July 6, 1959. Elizabeth had consulted Dr. Reznikoff. Chambers, from his examination of the medical records, had arrived at certain conclusions about the condition of Elizabeth's health, and had formed the opinion that as of September 17, 1956, the *260 life expectancy of Elizabeth was not more than one year; and he had indicated to Warren that he would recommend a deficiency in Chauncey Stillman's 1956 gift tax liability. Warren took Dr. Reznikoff to the July and October conferences for the purpose of attempting to settle the controversy about Chauncey Stillman's 1956 gift tax liability. Dr. Reznikoff discussed with Chambers the health condition and medical records of Elizabeth. Later, he prepared a letter dated October 27, 1959, (exhibit D), which Warren gave to Chambers, in which he stated his opinions as an expert about Elizabeth's condition of health. Dr. Reznikoff did not agree with the views of Chambers. It has been stipulated that prior to July 17, 1959, Chambers had obtained information about all of the matters which were discussed at the conferences, and Elizabeth's medical history for 1954-1956. There was another conference of Warren and Conway with Chambers and Murphy on November 6, 1959, which Dr. Reznikoff did not attend. These conferences did not persuade Chambers to change his views. Early in 1960, a preliminary letter proposing a gift tax deficiency was issued by the respondent. On April 19, 1960, Warren filed *261 a protest on petitioner's behalf to which he attached letters of 2 other expert physicians, as part of the protest, a letter of Dr. Lloyd F. Craver, dated April 11, 1960, (exhibit H) and a letter of Dr. Elliott F. Osserman, dated April 18, 1960, (exhibit G). The purpose of these letters was to convince Chambers and his associates in the Internal Revenue Service that the conclusions which Chambers had made from the medical records were not correct. Chambers' conclusion, that as of the date of the gift the life expectancy of Elizabeth was not more than 1 year, was his own conclusion, which he made even though he is not a physician and does not have any experience in or expert knowledge about any of the matters covered by the medical records of Elizabeth. He relied upon his own independent, layman's investigation of Elizabeth's medical record and his examination of some medical texts. On the other hand, there was not any statement or notation in Dr. Baker's files or in any other medical records of Elizabeth setting forth any period as Elizabeth's expectancy of life. No doctor consulted by Elizabeth and no expert produced by Warren, for the purpose of trying to settle matters with *262 Chambers about petitioner's gift tax liability during Chambers' investigation, made any statement giving a definite life expectancy for Elizabeth. Moreover, none of the experts who were consulted agreed with Chambers that as of September 17, 1956, Elizabeth had a life expectancy of not more than one year, as is set forth hereinafter. Chambers disregarded the opinions of the expert physicians. Chambers (according to his testimony) attached great importance and gave great weight to the fact that Elizabeth died on November 26, 1956. He reasoned that if he were valuing real property or stock of a closely held corporation, a sale of the property within a short period of time after the taxable event would be the best indication of fair market value; and by making an analogy of sale to death, he concluded that the best indication of the value on September 17, 1956, of the contingent remainder interest was the actual period of life of Elizabeth from the date of the gift until the date of her death. The valuation made by Chambers, based on a life expectancy of 1 year, was adopted by the respondent and is the basis of the final determination in the statutory notice of deficiency. Chambers' *263 determination was that as of September 17, 1956, the contingent remainder interest in the testamentary trust (the subject of petitioner's gift) was to take effect in possession and enjoyment at the end of a term of years, 1 year. He accordingly valued the remainder under the second sentence of subparagraph (d) of section 25.2512-5 of the Gift Tax Regulations, p. 32, which makes use of column 4 in Table II in subparagraph (f); he used the factor provided in column 4 in Table II in computing the present worth of a remainder postponed for a term of 1 year, namely,.966184, and valued petitioner's gift by multiplying the fair market value on the date of the gift of the assets of the testamentary trust, $3,727,230.80, by.966184. The value and amount of petitioner's gift of the remainder was thereby determined to be $3,601,190.76. The general facts, to the extent that they are necessary in this proceeding, about Elizabeth's general health on the date of gift, September 17, 1956, and prior thereto, are as follows: [2] For some time prior to 1956, Elizabeth was anemic, hereinafter called the first condition; and, also, the menopausal period began and continued during 1956, hereinafter called *264 the second condition. Both conditions were watched by her physician and a specialist was consulted. The second condition involved menorrhagia which caused a secondary anemia and made the control and treatment of the first condition more difficult. Diaguostic procedures were followed before 1956. A cause of the first condition was not found. The only treatment prescribed for the first condition consisted of iron (trade name, Moleiron), liver extract (trade name, Rubramin), vitamin B-12, and folic acid, some of which were given by injection in the doctor's office. The second condition occurred periodically. When advisable, standard treatment was prescribed, known as D and C, which is regarded as ordinary treatment, and examinations indicated that no radical treatment was necessary. When treating the second condition, a blood transfusion was given at times, which is standard procedure, and there is no evidence that the latter treatment was extraordinary or anything other than is customary in treating such condition, which is one that occurs in varying degrees in middle age. A D and C procedure was performed on July 1, 1956, at The New York Hospital, which was withstood well and she was *265 discharged on July 3. Medication was prescribed, testosterone tablets (a hormone). The condition improved and her doctor concluded that no further procedures were necessary and that this condition would end in due time. Elizabeth had a general physical and medical examination beginning the middle of May 1956, most of which was done at The Vincent *266 Astor Diagnostic Service (connected with New York Hospital), an outpatient service (not involving hospital admission); and some tests were made at the Presbyterian Hospital by the late Dr. Joseph C. Turner (who had passed away prior to the time of the trial of this case). Dr. Robert F. Watson, chief of Vincent Astor Service, made the general physical and medical check-up; he made a confidential written report, [3] the concluding notes being made July 9, 1956. His written report included a review of her entire medical history. Dr. Watson noted in it, inter alia, the following: Elizabeth told him in May that she planned "to be away from New York a great deal of the time in the near future." He found that she was "a welldeveloped, slightly thin woman of 50 years who does not appear ill"; that her appetite was excellent; her diet was good; she slept fairly well 8 hours each night; she was quite active physically during the summer months; she had only an occasional cold, and only an occasional mild headache; she saw well with glasses, which she used for close work; her weight had been stable for some years and there had not been any recent loss of weight. Upon the completion *267 of all of the examinations and tests, including the tests by Dr. Turner, Dr. Watson wrote, on July 9, in his conclusions and recommendations that she "appears to be in good general condition"; that she had a moderate anemia which "is periodically made worse by menorrhagia, which * * * should be handled symptomatically"; that she "should continue with iron and liver as before, but folic acid could well be omitted." With respect to the findings made by Dr. Turner through his tests, Dr. Watson wrote in his conclusions and recommendations on July 9 that she "appears to be * * * relatively asymptomatic [not having complaints that the doctors considered significant] except for a moderate anemia." Dr. Watson did not recommend that any specific treatment should be given at that time with respect to a problem indicated by Dr. Turner's findings. The only treatments recommended by Dr. Watson at the end of his written report on July 9, 1956, were (as stated above) that "She should continue with liver and iron as before, but folic acid could well be omitted"; and that the menorrhagia "should be handled symptomatically," as had been done before. As already stated before, Elizabeth went on August 1, 1956, to *268 England and Ireland with her husband and returned on August 28. During the trip abroad, she lived the strenuous life of a tourist, and she did not receive any medical care or treatment of any kind. Upon her return from the trip, she continued leading a normal life and engaged in her usual social and charitable activities and sports without restriction. As stated above, Dr. Turner made some tests at the Presbyterian Hospital. They were made on May 21, 1956, and June 8, 1956. Dr. Turner made certain findings as a result of making the tests. They were confidential. However, respondent's agent, Chambers, learned about the findings in the course of his investigation in 1959 into the medical records of Elizabeth. Respondent's determination of the gift tax liability of the petitioner for 1956 put into issue the matter of Dr. Turner's findings, and the following relate to them: One of Dr. Turner's tests was the extraction of marrow of the bone by aspiration and analysis thereof. He made the finding, confirmed by Dr. Watson, that plasma cells found in the bone marrow were "consistent with multiple myeloma." That finding constituted a diagnosis. [4] However, as stated above, upon the completion *269 of all of the physical and medical examinations, it was concluded by Dr. Watson in his report that Elizabeth was "relatively asymptomatic" with respect to multiple myeloma and that specific therapy for it was not then indicated. [5] There are and in 1956 and before there were well established therapies and therapeutic agents for treating of and dealing with multiple myeloma, and they were known to Doctors Turner and Watson. Dr. Turner was an eminent physician and full professor of medicine and the chief of hematology at the College of Physicians and Surgeons, connected with Columbia University. Dr. Watson's finding that in May, June, and July 1956, Elizabeth was relatively asymptomatic with respect to the diagnosed multiple myeloma meant that "she had no complaints that the doctors thought were significant." [6] In general, asymptomatic means without symptoms. Elizabeth's doctors did not prescribe and use any therapeutic agent for multiple myeloma (hereinafter called myeloma) prior to September 17, 1956, and up to and prior to that date there was not any recommendation by her doctors that any therapeutic agent for myeloma should be used. In October 1956, the doctors recommended the use *270 of a well established therapeutic agent and it was used, urethane. It is not uncommon that when an individual is found to have a condition in a certain mild or not sufficiently severe degree that competent physicians do not prescribe and use the major therapy or drug used in treating it. For example: In a mild or not sufficiently severe condition of diabetes, doctors may take the position that the individual does not require insulin, and that a prescribed diet will suffice as the treatment; or if a patient is found to have a mild heart condition, digitalis may not be prescribed and used. But subsequently, insulin or digitalis, respectively, as the case may be, will be prescribed and used. The same *271 principle would apply with respect to the treatment of myeloma. [7]
No one was told or knew about Dr. Turner's diagnosis except Elizabeth's doctors and her husband, who was so advised on July 2 or 3, 1956; and her husband was advised by Doctors Watson and Baker that there was no reason why he and Elizabeth should not go abroad, as planned, and that she should continue her normal activities. Specifically, Elizabeth was never told about the diagnosis; and petitioner was not told about the diagnosis at any time up to and including September 17, 1956. [8]
The following matters relate rather briefly to the disorder, multiple myeloma, and to the treatment and management thereof. [9] Multiple myeloma, also called plasma-cell myeloma, is a disease of the plasma cells. Plasma cells perform an important, normal function in the human system, manufacturing a necessary protein. When the plasma cells are affected by plasma-cell myeloma, they then produce an abnormal protein which is closely related to the normal protein. The disorder of plasma-cell myeloma affects the bone *272 marrow, usually involves many areas of the marrow, and represents tumor of the bone marrow. It is in this sense regarded as a bone disease but it is hidden, it is not observable externally, and, unlike other bone diseases, "bowing of the extremities does not occur." Some of the protein produced in plasma-cell myeloma is completely innocuous, and some can do damage. [10] It is well established that the preponderance of the disorder is in males, and that the majority of cases occur between the ages of 50 and 70. The disorder is no longer considered rare. [11] Although serious, the disorder is one which can be helped, treated, and managed by the use of any one of several therapeutic agents. [12]
The disorder, plasma-cell myeloma, is a chronic condition as distinguished from an acute condition (such as pneumonia). [13] Being a chronic condition, it is characterized *273 by many variables; it does not follow a particular pattern or run a particular course; the disorder in each individual is different and has its own, individual, clinical pattern; it can be present in many different ways; and there is no such thing as a typical case. [14] The clinical pattern of the disease varies widely in each individual, from case to case. The main characteristic of the disorder is that it is variable in each individual and from case to case, and that it is affected by variables of many kinds. Because of the variability of the disorder, the outstanding characteristic is its unpredictability in an individual case. It is also a condition in which remissions occur, both subjectively and objectively. [15]
Among the factors which contribute to the variability of the disorder in each individual case are the following: age, race, prior medical problems; differing growth rates of abnormal plasma cells in different individuals; the unpredictable extent to which the specific *274 abnormal protein produced by the affected plasma cells will be harmful and interfere with various bodily functions, or will be tolerated, or will be innocuous; and the functional individuality of each person at the biochemical level. In addition, there is much variation in each individual's particular response to a particular therapy; there is variation in the periods of remission; there are several therapies; and new therapies are developed. Progress from year to year in the medical understanding of the disorder and in the development of new therapeutic agents represent another variable, and such progress is unpredictable. Since 1950, there has been impressive progress in knowledge and understanding and ability to treat and manage multiple myeloma. [16] Such progress has resulted, at least in part, from extensive research and the establishment of clinics devoted to the study and treatment of the disorder, located throughout the United States, where records are maintained. One of the outstanding clinics is the Francis Delafield Hospital, connected with the College of Physicians and Surgeons of Columbia University, which is devoted exclusively to the study and treatment of multiple myeloma, *275 and has the most comprehensive program in the United States covering the study and treatment thereof. Dr. Elliott F. Osserman is the director of that clinic, and has been since 1953, where he also directs and runs the laboratory. He is one of the very outstanding medical authorities on multiple myeloma and the treatment thereof; he is an associate professor of medicine at the College of Physicians and Surgeons, and is a physician at Francis Delafield Hospital and The Presbyterian Hospital. The established therapeutic agents used in treating and managing myeloma include X-ray therapy; irradiation, or radiation therapy, or radiotherapy; the use of adrenocortical steroids and ACTH; and urethane, the use of all of which was well established before 1956; [17] urethane therapy has been used since 1947. A new and highly effective therapeutic agent, melphalan, was first used outside the United States in 1956. Melphalan therapy was introduced in the United States in October 1960. [18] Both urethane and melphalan therapies are used at Francis Delafield; melaphalan therapy has been used there since October, 1960. *276 The criteria used by physicians to evaluate the effects of the use of a therapy and therapeutic agent in treating myeloma include the following objective evidence of remission in the disorder; disappearance of the abnormal proteins or improvement thereof; improvement in blood count; decrease of myeloma cells in bone marrow; actual bone healing and bone improvement as shown by X-rays; and the performance status of the individual, i.e., the activity of the individual, the perfectly-well feeling of the individual, and the lack of need of medication. [19] There is also subjective evidence of remission. Success in therapy and the effecting of remissions results in prolonging the life of the individual. At Francis Delafield and other clinics, exact records have been kept of the effectiveness and benefits resulting from particular therapies, of which the following are a few examples: [20] There was a report [21] in 1955 of the treatment of an individual which began in 1932; in 1954, 22 years thereafter, the individual showed no clinical evidence of myeloma and was considered as representing an instance of an apparent therapeutic cure from radiotherapy. There was a report in 1956 on the study *277 of 4 cases, with survival periods of from 7 1/2 to 13 years where various therapies were used, or "nothing at all." [22] In another case, reported in March 1948, a man was first treated in May 1939 when he was 61 years old. Eight years later, in November 1947, after intermittent treatments, he was fairly well and was working as a night watchman. [23]
The periods of remission in the condition, although variable, run several years, 6 years or less, 8, 9, 10, 11, 13, 15, 19 and (as shown above) 22 years. Accordingly, the "course" of the myeloma condition can be prolonged. In terms of activities, remission means a change in the condition of the individual, such as from "sick" to relatively well. By 1956, considerable *278 progress had been made in the treatment of myeloma by the use of urethane therapy. A significant number of cases of myeloma, between 20 to 40 percent, exhibited both subjective and objective evidence of remission after urethane treatment, according to a report by Dr. Osserman in 1959. In Dr. Osserman's clinic, the following case of a woman is recorded: In 1956, a diagnosis was made of multiple myeloma, and at that time this woman was about the same age as Elizabeth, about 50. This woman has been a patient of Dr. Osserman since May 1956. The general picture of her myeloma at that time was the same as in the case of Elizabeth. At some time after the diagnosis she received urethane and radiotherapy. She is still living; she is entirely asymptomatic; she is perfectly functional, as the following shows: She is a mother, she takes care of a seriously ill husband, she visits the Francis Delafield Clinic once in every 6 months; she is as functional as any average person. She has not received melphalan therapy but if the condition flares up again, she may receive melphalan. She has been effectively treated with urethane. [24]
*279 At the Francis Delafield Clinic, patients have received melphalan therapy since October 1960, which has proved to be highly effective in bringing about remissions or suppression of myeloma. In Dr. Osserman's experience, such remissive effects were achieved in 70.8 percent of cases which were evaluated in a study under his supervision (17 out of 24), with probable evidence of suppression in 4 additional cases. Among these patients, several had received other kinds of therapy, including urethane, prior to receiving melphalan, including an individual who has had myeloma since 1953 and is still alive and active. (Case No. 3, L.H., exhibit 10.) There were similarities between the cases of Elizabeth and that individual (L.H., exhibit 10). In the case of L.H., supra, the onset of myeloma is not known, although the diagnosis apparently was made in 1953. It is expected by Dr. Osserman that he will continue to react well to therapy "for an indeterminate length of time." [25]
Prior to and including September 17, 1956, no urethane therapy was recommended or used in the case of Elizabeth by her doctors, *280 and no other therapy of such type or radiotherapy for myeloma was recommended or used by her doctors, who believed none was indicated. Dr. Osserman testified that as of September 17, 1956, it was possible that if urethane therapy was thereafter used it might have had the beneficial effect of bringing about a remission in the myeloma condition; that such remission might have extended until October 1960 until the use of melphalan therapy, which she might have received with beneficial, remissive effects. Myeloma is a chronic condition which can last for a good many years and be prolonged, but, also, that is not always the case. [26] In the experience of Doctors Reznikoff and Osserman, individuals who had a relatively similar general picture as Elizabeth had on and before September 17, 1956, have lived many years and are still living. Individuals who have the chronic condition represented by myeloma can experience all of the other ailments to which the human system is susceptible, such as pneumonia, heart disease, diabetes, an aneurism of the aorta, kidney disease, and other diseases. (In the case of Elizabeth, she had another chronic condition, middle age menopause and menorrhagia which *281 was treated and kept under control.) In Dr. Osserman's experience, one of his women patients, 70 years old, who has myeloma, suffered an aneurism which was a major threat to her life; she survived the major operation of the removal of the aorta and the replacement thereof with a dacron pipe or tube; her longevity is more likely to be affected by the aorta problem than by her myeloma condition, in his opinion. The immediate cause of the death of an individual who has both myeloma (a chronic disorder) and some other disease can be the other disease (such as heart disease); a person having myeloma may die because another disease is the immediate cause of death. [27]
In the diagnosis and presence of myeloma, various things are evidence of the existence of this chronic disorder, but the presence of any one of the various things which can be present is not in itself indicative of eventual death. For example: Various factors can be controlled; bone involvement causes pain but not death; and the general condition may become *282 suppressed under a remission upon the proper administration of a proven therapeutic agent. [28] When there is suppression many of the symptoms improve and blood count may return to normal. [29] Myeloma eventually can be the cause of death. Doctors Turner, Watson, and Craver, under written opinions, and Doctors Renzikoff and Osserman under both written opinions and in their testimony, were of the opinion that on September 17, 1956, on the basis of their examination of the medical records concerning Elizabeth, her chronic conditions, the condition of the myeloma on that date, and all available medical information relating to her, and their respective expert knowledge of myeloma, research in that field, and experience in the treatment thereof, no competent physician could foretell the future duration of life of Elizabeth, and that her life expectancy was wholly unpredictable. Dr. Turner had treated her, Doctors Watson and Reznikoff had been consulted by her. All are experts in myeloma. For the first time, in October 1956, Elizabeth's doctors prescribed and used urethane, but not before. The *283 entire medical evidence indicates that prior to the time urethane was used, her doctors found her condition with respect to myeloma to be such that the use of any one of several specific agents for its treatment, including urethane, was not required. No lesions [bone] were recognized in her case until November 9, 1956, when X-rays located them; they are a symptom of myeloma. On November 16, at her apartment Elizabeth went over various matters with her secretary, Alice Grauer, and wrote the following letter to Judge Herbert F. Goodrich, in connection with her duties as a member of the executive committee of the board of trustees of Vassar: Dear Judge Goodrich: It is with great regret that I must resign from the Executive Committee of the Board of Trustees of Vassar College because I have been too ill for the past two weeks to be able to go to the next Executive Committee meeting, which I know will be a very important one, and I want to give you time to appoint some-one in my place. I hope I am not too presumptuous in saying that if there is a place on the Executive Committee I would love to be reappointed next year, because I find this committee the most stimulating of all *284 committees. I am confident that I shall be strong enough to be active again, and indeed hope to get to the spring Trustees' meeting. Sincerely yours, Elizabeth died on November 26, 1956, after an illness of one month. The exact and immediate cause of death is not known. An autopsy was not performed. Dr. Baker, her attending physician, does not know just what brought about her demise. On November 21, 1956, just before Thanksgiving Day, Elizabeth's husband told petitioner for the first time about the diagnosis of myeloma. He did not tell petitioner about it prior thereto and petitioner did not know that his sister had a chronic condition which is serious. The myeloma disorder was a hidden and secret one. Petitioner and his sister lived apart in their homes and carried on, respectively, independent lives. Petitioner on September 17, 1956, did not have any knowledge or suspicion that his sister's condition of health was any different than it had been previously in 1956 and in prior years. He did not know about her private personal and medical affairs. Petitioner made a bona fide transfer of his contingent remainder on the gift date. Ultimate Findings of Fact 5. On September 17, 1956, the *285 future duration of life of Elizabeth, the life tenant, was wholly unpredictable and no qualified and expert physician, knowing all of the available medical facts and information about her general health and chronic disorders, could foretell or predict her duration of life. 6. On September 17, 1956, the value of petitioner's contingent remainder was $1,173,332.26. Opinion The question to be decided is the value on September 17, 1956, of petitioner's particular type of contingent remainder interest in the trust created by the terms of his grandfather's will, of which his sister was the income beneficiary for life. The value is to be determined under the provisions of section 2501(a), 1954 Code, which imposes a gift tax upon the act of the transferor in making a transfer of property; and under section 2512(a), which provides that the value of the property at the date of the gift shall be considered the amount of the gift. Robinette v. Helvering, 318 U.S. 184; Harris v. Commissioner, 340 U.S. 106; 1 Mertens, Law of Federal Gift & Estate Taxation, p. 336, section *286 6.01. The gift tax is not an excise imposed on the transferee's receipt of property. The respondent determined the value on the date of gift of the interest that was transferred to be $3,601,190.76. His computation of value involves the assumption that the interest that was transferred was simply a remainder that was "to take effect at the end of a term of years," within the provisions of section 25.2512-5(d)[30] of the Gift Tax Regulations under the 1954 Code, and he used the method of valuation therein prescribed. He first made the determination that the interest was a remainder that was to take effect at the end of a term of 1 year. His computation of the value under subparagraph (d) followed upon making this primary determination. *287 Section 25.2512-5(a)(2) provides in part that if a remainder or other interest is dependent upon more than one life, the present value is computed under subparagraph (e) and, "for the purposes of the computations described in this section [25.2512-5], the age of a person is taken as the age of that person at his nearest birthday." Section 25.2512-5(e) applies to the valuation of the contingent remainder in issue. However, since the interest in the testamentary trust was dependent upon the continuation or termination of more than one life, a special factor is required to compute the value under the regulation, and the method of getting it is provided by Exmmple 7 in the IRS pamphlet, Publication No. 11, Actuarial Values for Estate and Gift Tax. (The remainder to be valued in this case is a future interest of a different type than was in issue in any of the Jennings group of cases referred to later.) Prior to the issuance of the IRS pamphlet in 1955, it was necessary for a taxpayer to apply to the Internal *288 Revenue Service for the correct special factors, but petitioner's counsel was able to work out the necessary special factor from Publication 11. Example 7 gives the method for computing the special factor to be used in determining the present worth of one dollar due at the death of the older of two persons of specified ages, provided the younger survives. Petitioner's computation of the special factors is as follows, and respondent has never questioned its correctness: Ages - Chauncey Stillman, born 11/9/1907 - 49 years of age (nearest birthday); Elizabeth Stillman Williams, born 10/27/1905 - 51 years of age (nearest birthday). Factor from Table I for the present
worth of $1.00 due at death of a person
aged 49
$0.46859
Factor from Table I for the present
worth of $1.00 due at death of a person
aged 51
0.49215
Total
$0.96074
Less: Factor from Table III for the
present worth of $1.00 due at the death
of the last to die of two persons aged
49 and 51
0.38010
$0.58064
Multiplied by Factor F from Table IV
for a difference in age of 2 years
.54684
$0.31752
Less: Factor B from Table IV for a
difference in age of 2 years
.00272
Present worth of $1.00 of trust corpus
due at death of Elizabeth Stillman Wil-
liams, provided Chauncey Stillman sur-
vives
$0.31480
*289 The special factor required by section 25.2512-5(e) of the regulations for valuing the remainder is, as shown above,.31480. The rest of the computation of the value of the contingent remainder is: Value of trust corpus Sept. 17,
1956
$3,727,230.80
Multiplied by special factor
.31480
Value of contingent remainder
$1,173,332.26
The respondent's determinations as to the nature of the remainder and the value thereof are prima facie correct, and the petitioner had the burden of proving error in the determinations. The petition sets forth the following allegation of error: 4. The determinations of the tax set forth in the said Notice of Deficiency are based upon the following error: In valuing the transfer in trust made by Petitioner on September 17, 1956, Respondent erroneously and unlawfully did not use the fair market value of the remainder interest transferred given by Table 38 of the United States Life Table and Actuarial Tables 1939-1941 and interest at the rate of 3 1/2 per cent per year compounded annually, as prescribed by Section 2512 of the Code and Sections 25.2512-5(a) and (e) of the Gift Tax Regulations promulgated thereunder, and Respondent's *290 valuation of such interest grossly exceeded its fair market value. Respondent in his answer denied the above allegations of error. He did not make any affirmative allegations in his answer. He did not have any burden of proof. The nature of the remainder in issue was determined and fixed by the terms of Article Eighth of the will of James Stillman, which are set forth in the findings. Under Article Eigth, the remainder was not one which was to take effect at the end of a term of years. Petitioner's remainder under the will was a contingent remainder dependent upon the continuation or termination of more than one life. There actually is not any issue about this point; respondent has never questioned the terms and meaning of Article Eigth. The reason why the respondent made his primary determination is that he adopted the determination of his agent, Chambers, that on the date of the gift the life beneficiary of the James Stillman testamentary trust "had an expectancy not in excess of 1 year." (Notice of deficiency statement, p. 3.) He therefore valued the contingent remainder as though it were a remainder which was to take effect at the end of a term of years. Another way of explaining *291 respondent's determination is as follows: Petitioner's contingent remainder is the type with which section 25.2512-5(e)[31] of the regulations deals, and it squarely comes within that regulation. The method of valuation prescribed by subparagraph (e) is an actuarial method which uses factors, based on age only, computed under the standard mortality and actuarial tables. The tables set forth average life expectancies based on age. See Sinclair Refining Co. v. Jenkins Co., 289 U.S. 689, 698 (an estate tax case but the reasoning referred to is equally applicable under the gift tax). The respondent decided that he would not use the actuarial method of valuation prescribed in subparagraph (e) and would not comply with that regulation. He decided instead to use the method of valuation prescribed in and to follow subparagraph (d). He took into account, inter alia, that before the due date for the filing of the gift tax return for 1956, April 15, 1957, the life tenant of the testamentary trust had died. Thus, in his supplemental brief (pp. 8-9), respondent argued as follows: Of vital *292 importance also is the fact that Elizabeth Williams actually died within two months after the date of the gift and before the end of the calendar year 1956. Therefore, petitioner knew at the close of the calendar year 1956 and before the due date for filing the gift tax return, April 15, 1957, that his sister had died. What better evidence of the life expectancy could be offered than the fact of death occurring within such a short period after the date of the gift. *293 Petitioner contends, inter alia, that in effect the respondent (as well as his agent, Chambers) relied upon and applied hindsight in arriving at and making his deficiency determination, and that he did not make his determination of the value of the contingent remainder at the date of the gift, as he is required to do. Petitioner also contends (at length) that since the contingent remainder is of the type that clearly comes within section 25.2512-5(e) of the regulations, respondent was bound by subparagraph (e) and was obliged to value the contingent remander by using the actuarial method of valuation therein prescribed, because that regulation and method, in substance, have been in effect in both the estate and gift tax regulations for so many years that the regulation and method have acquired the status of the rule of law, and respondent's regulation requiring the use of actuarial tables is an expression of Congressional policy and intent under the doctrine of Helvering v. R. J. Reynolds Tobacco Co., 306 U.S. 110, 114-116. Finally, petitioner contends that, if evidence about the condition of health of the life tenant at the date of the gift is relevant and material, *294 and admissible, all of which petitioner asserts is not the case (particularly because it was and still is asserted that all of the medical records of the life tenant were inadmissible under the physician-patient privilege established by section 14.308 of the District of Columbia Code, unless the privilege is waived by the patient or his legal representative [32]), then the medical evidence and medical expert opinions do not establish that on September 17, 1956, the probable duration of life of the life tenant was not more than one year; rather the medical evidence and medical expert opinions establish that on the date of the gift the future duration of life of the life tenant was uncertain, was unpredictable, and on the above date, it could not have been predicted that the life tenant would not be alive today. In that situation, the petitioner argues that the provisions of section 25.2512-5(e) and the method of valuation therein prescribed apply, rather than section 25.2512-5(d), and his valuation of $1,173,332.26 must be sustained.
*295 The conclusion and finding are that the value on September 17, 1956, of the contingent remainder was $1,173,332.26. All of the lengthy medical evidence and medical opinions relating to the life tenant on the date of the gift and prior thereto have been carefully and thoroughly examined and considered, which in itself has been a weighty matter because that evidence is not only substantial and lengthy but also it is technical. There are many exhibits which include medical articles and charts, and there are the medical opinions of six physicians who either testified or gave written opinions about the probable duration of life of the life tenant on the date of the gift. Although the medical evidence does not leave any doubt in the mind of this Court about the conclusion to be drawn therefrom, all of that evidence has been gone over very meticulously, and considered more than once, for example, in order that every factor would be given the proper weight. Lengthy findings of fact have been made. The ultimate findings of fact set forth the findings made on the basis of all of the medical evidence. That evidence does not support the respondent's determination that on the date of the gift *296 the life tenant had an expectancy of not in excess of one year. The life tenant was found to have in May 1956, and certainly for several months prior to the diagnosis made in May and June 1956, a serious disease affecting the plasma cells in the bone marrow. But it represented a chronic condition which could be treated by using any one of several therapeutic agents, or a combination of them, which could have the beneficial effect of bringing about remissions in the condition. The disorder is a hidden one. Since it is so variable in its nature and course in each individual and is one in which remissions can occur in response to the prescription and use of a therapeutic agent, in general, a qualified physician, expert and learned in his knowledge of the disorder and experienced in the treatment thereof, cannot predict with any degree of medical certainty what length of time will be the probable duration of life of a particular individual from the time of the diagnosis or of the first onset of the symptoms. This was true in Elizabeth's case. Without attempting to summarize the medical explanation for the above, it is sufficient to explain that in mutiple myeloma an abnormal protein *297 is produced which closely resembles the normal protein; each individual having this disorder produces his own uniquely abnormal protein which is on the biochemical level unlike any other abnormal protein which has been produced in other individuals; and in each individual the experienced and expert doctors and technicians dealing with the case cannot estimate or foretell how the individual will tolerate or react to his particular disorder. He may tolerate it well even without therapy because even though abnormal the protein may prove to be innocuous to him. The disorder may affect his kidney function, or resistance to disease, or the coagulation of the blood, or the circulatory system, or a combination thereof. As a disease, this disorder of the plasma cells is extraordinarily unpredictable; and another major characteristic is that its course may be very prolonged and may be characterized by remissions (a reduction of the symptoms and improvement) and exacerbations (becoming worse). The bettering and the worsening phases cannot be foretold in a particular individual. The use of certain established thereapeutic agents can check the exacerbation and produce remission. Other variables *298 are the progress in the expert knowledge of and research in the disorder, the skills developed in the prescription and use of the thereapeutic agents in each case, and the development of new and better therapeutic agents. Dr. Osserman is a specialist in the study and treatment of the disorder of very outstanding ability and he has achieved substantial success in treating individual cases; that is, his treatments and techniques produce beneficial results and remissions (although he ascribes much of the successful results to the "chemistry" at work in the individual case). His testimony is that the disorder is no longer regarded as either rare or one which cannot be helped and managed for a long period of time, and according to his testimony that was the situation in 1956. His testimony establishes that in 1956, the therapeutic agent, urethane, was well established and used with beneficial results in a substantial number of cases; and that an even better agent, melphalan, was in existence in 1956 (although not yet introduced in the United States) and was used in the United States beginning in 1960. As of September 17, 1956, it was possible in the case of Elizabeth that when eventually *299 her doctors decided that a therapeutic agent should be used (which they did not believe was necessary as of that date), the use of urethane would have achieved remissions until 1960, when, if indicated, melphalan could have been used, also with the beneficial remissive effects. The life tenant involved in the valuation of petitioner's contingent remainder had two chronic conditions as of September 17, 1956. She knew about one, the menopausal state and its complications. That chronic condition was controlled by standard treatments and as of the above date was regarded by her doctors as a condition which would cease to be a problem in due course. She did not know about the second chronic condition and no one else did except her husband and doctors and the related medical technicians. The myeloma, chronic condition, as of the above date, had been diagnosed in May and June 1956, but as of the above date her doctors did not regard the condition as having reached the point where a therapeutic agent should be used. She was not an invalid and her activities were not restricted. Although the comparison is not medically exact, she was as of the above date somewhat in the position of a person *300 who was known to have diabetes but not to the degree that some doctors would prescribe the use of insulin. She was, as of about July 9, 1956, with respect to the myeloma, in good general condition and relatively asymptomatic. Dr. Watson wrote in his concluding report (exhibit M) as follows: "More specific treatment for the myeloma such as X-ray, urethane, or steroids may be necessary in the future as indicated." As of September 17, 1956, there is no evidence that her doctors believed that urethane or some other treatment was indicated, or that they then knew or anticipated when specific treatment would be indicated. There is evidence that in September 1956, the analysis of the blood composition showed an increase in the anemia and other changes in the blood composition and that the blood condition was not as good as it had been in June. But the testimony of Doctors Reznikoff (a hematologist) and Osserman, both acquainted with that analysis, establishes that this change was not one that could not be treated or one that was indicative of an extreme development. Elizabeth was never hospitalized, i.e., did not become a bed patient in a hospital, for the specific treatment of the myeloma *301 condition, and that was true as of September 17, 1956. Doctors Watson, Turner, and Baker, all of whom saw and treated Elizabeth before and up to September 17, 1956, and Doctors Reznikoff, Osserman, and Craver, among the most well informed and experienced doctors in myeloma, who examined her medical records, all agreed that on the above date, her life expectancy was most certainly unpredictable. None of these experienced and expert doctors could or would estimate her probable duration of life. Doctors Reznikoff, Osserman, and Craver pointed out the relatively long duration of life of some of the known persons who received treatment for myeloma with beneficial results, among whom were those who lived from 15 to 22 years after the diagnosis of the disorder. Dr. Osserman testified under cross-examination by respondent's counsel that it was not beyond the realm of possibility that an individual with myeloma could live out his full life expectancy, or very close to it. The evidence shows that in October 1956, Elizabeth's doctors for the first time prescribed the treatment of urethane thereapy, and that X-rays taken on November 9, for the first time showed bone lesions, a symptom of myeloma. *302 The evidence does not show precisely the direct and immediate cause of death. Dr. Baker testified that actually she did not know the exact cause of death. Dr. Osserman testified that the exact cause of death was unknown. The exact and immediate cause of death of individuals having myeloma has been known to be other conditions, a pneumonia or trouble with the heart or a kidney. An individual with myeloma may eventually die because of it or because of something else. The critical fact which is established by very substantial evidence is that on September 17, 1956, Elizabeth was relatively asymptomatic as to the myeloma; her very competent doctors, including the late Dr. Turner, did not find that the myeloma needed any of the established treatments, namely the use of urethane or a similar therapeutic agent. The condition was known to be present, as a chronic condition, but the attending doctors did not then find or have evidence of definite progress. In short, as of the above date the doctors did not observe that the myeloma was either severe or critical. Dr. Watson's report stated as of July 9, 1956, that in the future, specific treatment employing urethane or other agents might be *303 necessary, but as of September 17, 1956, such specific treatment had not been found to be necessary. As of September 17, 1956, therefore, Elizabeth had a disorder characterized by variableness and unpredictability, remissions (bettering) and exacerbations (worsening). In remissions, the individual becomes symptom-free, the blood count returns to normal, and even bone symptoms disappear (to which Dr. Baker and others testified). What course the myeloma would take after that date could not be predicted. Nor was that status of unpredictability in Elizabeth's case as of September 17, 1956, an uncommon one among individuals having a myeloma disorder. The testimony of the medical experts and the medical articles introduced into evidence show that among individuals having a similar set of medical findings and history as in the case of Elizabeth at that date, the future duration of life is unpredictable. The expert medical opinions in this case of four physicians expert in myeloma and the treatment thereof, Reznikoff, Osserman, Craver, and Watson (and of Turner, who died before the trial of this case) are in agreement that the life expectancy of Elizabeth on September 17, 1956, was most *304 certainly unpredictable. Dr. Turner's written opinion is in accord. That substantial medical opinion of four experts distinguishes this case from those where the medical testimony and evidence was to the effect that as of the particular valuation date involved a life tenant or measuring life would die within a stated period, that death was predictable, or imminent, impending, or soon to take place. None of the above four doctors testified to that effect here. Specifically, on the basis of the medical evidence here, the instant case is distinguishable from the following five cases upon which, in substance, the respondent has placed a great deal of reliance: Estate of John Halliday Denbigh, 7 T.C. 387; Estate of Nellie H. Jennings, 10 T.C. 323; Huntington National Bank, 13 T.C. 760; Estate of Nicholas Murray Butler, 18 T.C. 914; and Estate of John P. Hoelzel, 28 T.C. 384. The four latter cases are the Jennings group cited for the Jennings rule. The parties introduced into the record of this case as five joint exhibits the records of each of the above cases, and in each one the medical testimony fixed the duration of *305 life within a period of one year, or two years, less than one year, or was to the effect that death was expected at any moment; and in those cases the individual involved was bedridden, or almost totally paralyzed, or was in a hopeless, postoperative condition, or was a total invalid. At the time of the gift, the present value of petitioner's contingent remainder depended upon an indeterminable factor, Elizabeth's life expectancy. In Bankers Trust Co. v. Higgins, 136 F. 2d 477, 479 (C.A. 2, 1943), Judge Learned Hand observed in a similar problem: When compelled to take present action based upon forecasts of a man's life, courts have for a long time been accustomed to use mortality tables; * * * and it so happens that in this particular matter the probability has been refined by averaging an enormous number of instances. The mortality tables should therefore have been used to fix this one [life expectancy] of the two missing factors. Petitioner established here (and in so doing satisfactorily discharged his burden of proof) that his contingent remainder was not as of the date of his gift nothing more than a remainder for a term of one year or some other definite *306 term, as respondent concluded in making his primary determination. Petitioner established, also, that a determination could not be made with exactitude about when the contingent remainder would "fall in" and pass to a remainderman. Under similar circumstances, in Hipp v. United States, 215 F. Supp. 222, 226-228, the court stated: The valuation of future interest is at best a highly speculative undertaking not unlike the determination of life expectancy which courts and juries are called upon to make in almost all personal injury actions. Recognizing that the value of future interest cannot be determined with any degree of certainty, those called upon to make valuations have resorted to established computations which seldom accurately predict the value in a particular situation but prove to be accurate when used in a great number of instances. * * *
The Government argues, and the taxpayers concede, that where the facts show that a valuation can be made in a particular case with exactitude, the tables should not be used. In the present case, however, the valuation of the *307 gift cannot be determined with any degree of certainty. * * *
After a careful study of the evidence presented in the case relating to the income possibilities of Liberty Life stock and the power conferred upon the trustee to sell the corpus assets and reinvest the proceeds in other assets, the Court is convinced that any valuation of the income interest would be little better than a guess. In such a case it is clear that the method prescribed by the regulation should be used. In Carl E. Weller, 38 T.C. 790, 803-805 (involving the valuation for the gift tax of an interest in income from property for a fixed period), this Court refused to sustain respondent's departure from the applicable regulation and valuation method therein prescribed, an actuarial method, and his valuation under another regulation and method. And in May T. Hrobon, 41 T.C. 476, 500-502, this Court sustained the use of the actuarial method of valuation prescribed in the applicable regulation, and rejected the taxpayer's contention that some other valuation method should be used because the person whose life was the measuring life was an "inferior risk" because of a chronic condition *308 of health. Finally, there is the authority represented by Ithaca Trust Co. v. United States, 279 U.S. 151, reversing 64 Ct. Cl. 686, the principle of which applies to the gift tax, Commissioner v. Marshall, 125 F. 2d 943. See, also, M. E. Walter v. United States, - F. 2d - (C.A. 6, Feb. 9, 1965). Broadly stated, the principle of Ithaca Trust is that the measure of the tax must be determined according to the situation as it existed on the date of the taxable act, the death of the decedent (for the estate tax), or on the date of gift (for gift tax), and not according to subsequent events, "[tempting] as it is to correct uncertain probabilities by the now certain fact." (P. 155.) Exactly how the Ithaca Trust principle applied in this case initially presented a problem because the petitioner contended that evidence about the health conditions of the life tenant on the date of gift was, first, inadmissible under the physician-patient privilege; second, was immaterial and irrelevant because section 25.2512-5(e) of the regulations apply, which prescribes *309 exclusively the actuarial method of valuing the contingent remainder using factors derived from the mortality and actuarial tables and excludes consideration of facts about health conditions; and third, the Jennings rule adopted by this Court in the Jennings group of cases, supra, is incorrect, as a matter of law, because the status of section 25.2512-5 (e) of the regulation is that of a rule of law, and this Court made an incorrect application of United States v. Provident Trust Co., 291 U.S. 272, affirming 2 F. Supp. 472, in Estate of Nellie H. Jennings, supra. It is not necessary, in view of the ultimate findings of fact, to discuss this group of petitioner's contentions. All of them were thoroughly and very ably argued by counsel for petitioner and for the executors of the estate of the life tenant. All have received the utmost consideration by this Court. During an adjournment in the trial of this case, the Denbigh, Jennings group of cases, Ithaca Trust, Provident Trust were fully reviewed; consideration was given to the rule that what criterion *310 shall be employed to determine the value of property on a particular date is a question of law, Powers v. Commissioner, 312 U.S. 259; Publicker v. Commissioner, 206 F. 2d 250, 252, certiorari denied 346 U.S. 924; and to the rule that the gift tax is supplementary to the estate tax and the provisions of the gift tax statute and the estate tax statute are in pari materia and must be construed together. Estate of Sanford v. Commissioner, 308 U.S. 39. After considering all of the above, this Court orally made the ruling that the so-called Jennings rule, being a rule in this Court, must and would be considered in this case for the purpose of the gift tax. As previously noted, objections to the admissibility and materiality of the life tenant's conditions of health at the date of gift were overruled. Respondent thereafter, although he did not have a burden of proof, initiated the introduction of the medical evidence in support of his determinations and presented testimony of Chambers, his agent, and of Doctors Baker, Reznikoff, and Geller, *311 and several exhibits consisting of medical records of Elizabeth and articles dealing with multiple myeloma. Prior to the Court's above rulings, petitioner did not introduce medical evidence, but did so thereafter in rebuttal, following the admission of respondent's medical evidence, reserving, nevertheless, the objections which have never been abandoned. With respect to exactly what the Jennings rule is and how far it goes, the parties on brief are in some disagreement. To clarify the matter, references are made to statements which are representative of that rule. See Estate of Butler, supra, pp. 919-920, "The facts in existence at the time of decedent's death were such as to render it certain that * * * would not live more than one year after decedent's death"; and Carl E. Weller, 38 T.C. 790, 803 (involving the gift tax) where the Court said: Petitioners' contention brings them squarely within the rules of section 25.2512-5(c) and they must be sustained unless it is shown that the result is so unrealistic and unreasonable that either some modification in the prescribed method should be made, Estate of Irma E. Green, 22 T.C. 728 (1954), *312 Huntington National Bank, 13 T.C. 760 (1949), or complete departure from the method should be taken, and a more reasonable and realistic means of determining value is available. See Ithaca Trust Co. v. United States, 279 U.S. 151 (1929); Commissioner v. Marshall, 125 F. 2d 943 (C.A. 2, 1942); McMurtry v. Commissioner, 203 F. 2d 659 (C.A. 1, 1953); Betty Dumaine, 16 T.C. 1035 (1951). The problem of applying the rule of Ithaca Trust in this case is stated by petitioner to consist of an inexact construction by this Court in the Jennings cases of a statement in $2Provident Trust. There the issue related to a question of law about the status of a particular legal presumption, whether it was irrebuttable or was open to rebuttal, and under that issue there was the question whether evidence about the physical condition of the life tenant was admissible. The question there of the admissibility of evidence arose within the context of considering the policy of the rule of law that certain presumptions as to a physical condition either are or are not irrefutable. The Supreme Court held that the particular presumption was *313 open to rebuttal and, therefore, evidence was admissible for that purpose. Obviously, the context in which the evidence question arose in Provident Trust was not the same in the Jennings group of cases, for Provident Trust dealt with the question of presumptions of law and fact. It was, rather, in the Jennings cases a matter of analogizing an alleged presumption that an apparently applicable estate tax regulation had the status of an irrefutable presumption of a rule of law which was not open to rebuttal by proof of certain facts. In Provident Trust, the rule stated is, "The value thereof [a remainder interest] must be determined from the data available at the time of death of the decedent." Whether or not the rule in Provident Trust enlarged upon, explained, extended, or modified the rule of Ithaca Trust, or was misapplied by this Court in the Jennings group of cases and in Denbigh is now a moot question in this case. The objections, on the ground of admissibility, to evidence about Elizabeth's condition of health on the date of petitioner's gift were overruled. The ultimate findings *314 of fact which have been made here leave only Ithaca Trust for consideration. In Ithaca Trust, the Supreme Court [33] held (syllabus, par. 2, p. 279) that the value of the remainders to charities was "to be determined from mortality tables showing probabilities [of the duration of life of the widow, the life tenant] when testator died, though widow died within the year allowed by section 404 and regulations for filing of return." The reasoning of the Supreme Court was: The first impression is that it is absurd to resort to statistical probabilities when you know the fact. But this is due to inaccurate thinking. The estate so far as may be is settled as of the date of the testator's death. * * * The tax is on the act of the testator not on the receipt of property by the legatees. * * * Therefore the value of the thing to be taxed must be estimated as of the time when the act is done. * * * Like all values, as the word is used by the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes true. * * * Tempting as it is to correct uncertain probabilities by the now *315 certain fact, we are of the opinion that it cannot be done, but that the value of the wife's life interest must be estimated by the mortality tables. * * * *316 The reasoning of Ithaca Trust which is controlling here is this: Petitioner's contingent remainder was subject to the life interest of Elizabeth and its present value on the date of gift was diminished by the postponement that would last while she lived. The question of the amount of the diminution must be determined on the basis of the probabilities of the length of postponement "as they stood on the day" petitioner transferred the contingent remainder, and it is not to be determined "by the event as it turned out," her death during 1956, before the due date for the filing of petitioner's 1956 gift tax return. The amount of petitioner's gift, so far as it may be, "is settled as of the date" of petitioner's gift, and "the value of the thing to be taxed [petitioner's act of making the transfer] must be estimated as of the time the act is done. * * * Like all values, as the word is used in the law, it depends largely on more or less certain prophecies of the future, and the value is no less real at that time [the date of the gift in this case] if later the prophecy turns out false than when it comes out true. [Citations omitted.] Tempting as it is to correct uncertain probabilities *317 by the now certain fact, we are of the opinion that it cannot be done." Petitioner's remainder was a particular type of contingent remainder, one to take effect upon the death of a specified person provided another specified person survived. On its face, the provisions of section 25.2512-5 (e) of the regulations and the actuarial method of valuation prescribed therein and in the cited pamphlet apply. However, at this point further comment about the medical evidence is made. Respondent's contention is in substance that application of the prescribed actuarial method of valuing the contingent remainder would produce an inaccurate result. About his effort to establish a basis for departing from section 25.2512-5(e), the following is noted: Respondent attempted to show through Dr. William Geller that a period of future duration of life of the life tenant on the date of the gift could be foretold. He relies on the estimate of a period of duration of life attempted by Dr. Geller, who was the only physician out of six who would undertake making such estimate. Dr. Geller's estimate corresponds with the respondent's determination. Dr. Geller qualified his opinion as a "guess" and said it *318 was about the life expectancy of "a" person having a medical record like the one he examined (Elizabeth's) and gave the rather ambiguous explanation that he would have to have more facts in order to have an "expert opinion," but he did not state the particular reasons for or what he meant by that general qualification. Since the testimony of Doctors Reznikoff and Osserman include explanations of the variableness of myeloma and that there are many factors in the disorder that doctors who specialize and carry on research in myeloma still do not understand, the reasonable inference from Dr. Geller's own qualifications of his estimate is that he, too, impliedly recognized the same elements of unpredictability about the course of the disorder as did Doctors Reznikoff, Osserman, and Craver, who, however, explained them. Dr. Geller stated that he was unfavorably impressed by the laboratory report on the life tenant's blood condition in September 1956, and the bone involvement. But he is neither a hematologist nor a specialist in multiple myeloma, either in the treatment, diagnosis, or research thereof, as are the above doctors. They, too, considered the same reports but did not evaluate factors *319 stressed by Dr. Geller in the unfavorable way that Dr. Geller did. Moreover, their respective opinions are not in agreement with Dr. Geller's. Dr. Craver's written opinion did not go into the particular matters stressed by Dr. Geller, but his opinion is not in agreement with Dr. Geller's; neither is Dr. Turner's written opinion. Dr. Turner was a hematologist, as is Dr. Reznikoff, and Doctors Craver and Osserman are members of the International Society of Hematology. Their opinions are entitled to and have been given more weight than Dr. Geller's. All of Dr. Geller's testimony has been fully considered. It is recognized that he is a distinguished physician, but his specialty is in another (but related) field. In evaluating his estimate it must be recognized that his knowledge and experience in the disorder of myeloma is not as extensive and is considerably more limited than that of Doctors Reznikoff, Osserman, and Craver. Reznikoff and Osserman did not regard the factors stressed by Geller as ones that would enable them to make an estimate of Elizabeth's life expectancy. On the other hand, Dr. Geller agreed that urethane therapy can have a beneficial effect. Dr. Geller's estimate *320 stressed a more limited phase of Elizabeth's medical record and chronic conditions, and was based on a more limited consideration of the variable aspects of the myeloma disorder, in general, than were the considerations of the three doctors mentioned above. In the light of the entire record, this Court is unable to give much weight to Dr. Geller's estimate of life expectancy. Respondent's counsel, on brief, with respect to Dr. Osserman's testimony about the beneficial effects of urethane therapy, contends that his testimony did not relate the progress in the use of urethane to the year 1956, but, rather, was about the progress that had been made as of 1959 in the use of urethane in treating myeloma. We do not agree with respondent's contention. Dr. Osserman's testimony on this matter has been rechecked, as well as his medical article on myeloma (exhibit 9) to which respondent refers. Respondent's contention is not well taken. Dr. Osserman's testimony and his discussion in his article (p. 16, exhibit 9) about urethane therapy are not limited to the year 1959 and are understood to include experience in the use of urethane back to 1947. Footnotes 202-208 (p. 19 of exhibit 9) provide *321 some of the sources of Osserman's statement to the effect that in the twelve years since the first report by Alwall in 1947 on the use of urethane in myeloma, numerous publications have confirmed the conclusion that urethane then appeared to be the most generally useful in a group of chemical agents of a similar type. Those footnotes provide the years of the publications referred to, and they are 1947, 1949, 1950, 1951, 1952, and June 1956. In 1952, Alwall published a report on his findings about urethane therapy during more than four earlier years. Dr. Osserman's testimony stands unrefuted. It is entitled to receive and has been given a large degree of weight. All of respondent's evidence, contentions, and arguments have been carefully considered, as well as certain inferences from the evidence which he suggests. No useful purpose will be served in setting forth in detail the reasons why, on the basis of the whole record, we are unable to find all or any of them persuasive, and why we cannot agree with certain inferences suggested by respondent, but the following should be noted: The record shows that the life tenant's doctors first used urethane therapy in October 1956. Dr. Watson's *322 notes in his written report under the date of July 9, 1956, shows that consideration was given to whether urethane should be used as a treatment of the myeloma at that time, and that it was concluded that the condition then evidently did not indicate that urethane or any other specific therapy was then required because she was relatively asymptomatic, but Dr. Watson noted that urethane or some other described therapy might be indicated at a later time. The inference from the entire record, is that her physicians concluded that neither urethane nor some other established therapy was required in June, July, August, and September. Dr. Osserman's testimony supports this conclusion. Respondent, who presented medical evidence, had ample opportunity to question Doctors Watson and Baker, who were attending physicians, and Osserman and Reznikoff about this matter. Petitioner went into the subject of urethane therapy at length in his examination of Dr. Osserman, whose experience in using it has been extensive at Delafield Hospital which, he testified, probably has the most comprehensive program in multiple myeloma in the United States (supplemental transcript, p. 212). Additional comment must *323 be made about the specific treatment for myeloma in relation to Elizabeth's chronic condition in 1956 and in connection with the opinions of Doctors Reznikoff, Osserman, and others that an estimate of her future life expectancy could not be made on the gift date. One of the factors which Osserman took into account was treatment of myeloma by using established therapeutic agents, including urethane. Respondent argues that the effectiveness of the use of urethane in bringing about remission in myeloma is speculative. Reznikoff and Osserman acknowledged that the effectiveness of the use of any established therapeutic agent in any particular case, including urethane, is one of the variable and unpredicatable factors in that disorder, but both produced charts showing that the use of therapeutic agents, including urethane, had been effectively use in bringing about remissions in the disorder in individual cases for a substantial period, for many years, even up to the present time. Thus, there is in the record evidence of actual case studies and statistical evidence that urethane, other agents, and later melphalan, were and are effectively used. That evidence shows that the possible effectiveness *324 of the use of therapeutic agents in treating myeloma was no longer, in 1956, merely speculative and contradicts Dr. Geller's comment about the effectiveness of urethane therapy. On the basis of all of this part of the evidence, including the testimony of Doctors Reznikoff and Osserman, all of which supports petitioner's contentions, petitioner is justified in arguing that as of September 17, 1956, it was possible that the use of urethane therapy thereafter in the case of the life tenant could and might have had the beneficial effect of bringing about a remission in the disorder; that it was possible on that date that a remission, if achieved, could and might have continued until the time in 1960, when melphalan was available, a new and highly effective therapeutic agent; that in that event, melphalan could and might have been beneficially used in her treatment, if indicated (Osserman in one of his cases, however, found urethane so effective that he did not make a change to melphalan); that the possibilities of effectively using therapy in the life tenant's case in suppressing the disorder should be taken into account in evaluating the expert modical opinion of Dr. Reznikoff that *325 as of September 17, 1956, it could not have been predicted that the life tenant would not be alive today; and that in evaluating the expert opinions of Doctors Reznikoff, Osserman, Turner, Watson, and Craver, there should be taken into account the possibility that as of September 17, 1956, the future use of some therapeutic agent (such as urethane) in the life tenant's case could and might bring about remission for a substantial period of years. There have been set forth in the findings at length and in detail the salient and material facts about the life tenant's conditions of health, as shown by the medical records, medical testimony, and written medical reports and opinions. The record relating to these matters is extensive. The issue of valuation of the contingent remainder which petitioner transferred embraces, under this Court's rulings, the life tenant's health conditions on September 17, 1956, in relation to her future life expectancy on that date. It is unnecessary to restate at this point all that has been stated in the findings, but there are a few points to be emphasized, as follows: The life tenant, to the experienced physician consulted during May - July, 1956, Dr. *326 Watson, did not appear to be ill; and during the months prior to and up to September 17, 1956, and thereafter she was engaged in the activities of a normal life, without restrictions, and those activities continued after the above date. The exigencies of this litigation have required, regrettably, examination and discussion about the private medical record and personal problems of the life tenant. But having gone into them, the only practical procedure is to appraise them, so that respondent's suspicions and doubts may be ended now, for all time, if that is possible. The layman, in the conscientious pursuit of the execution of his particular duties, may understandably become concerned and alarmed about the details he locates in an individual's medical records because of his having ventured over into areas in which, as an amateur, his deductions proceed from premises which are either not true, incorrect, or not sound. This Court has devoted an enormous amount of time and consideration in evaluating the entire record relating to the life tenant and it is its thoroughly considered judgment that the respondent's determination about the life expectancy of the life tenant on the date of *327 the gift was the result of (1) a great abundance of caution; (2) unwillingness to accept the professional explanations, evaluations and judgments of very competent and expert physicians, who disagreed with respondent's estimation and conclusions; and (3) unjustified concern, verging on being an alarmist, about the details of the life tenant's two chronic conditions, the first one being part of a middle age problem, and the second, the myeloma. The reasonable explanation about the alarmist interpretations made by the respondent, about the life tenant's situation on September 17, 1956, is that by the time he made his determination, he knew that the life tenant died later in 1956 (which he could not have foretold on September 17, 1956), and having that knowledge in mind, he attributed to many of the detail, in the afterdiscovered medical records of the life tenant, the most hopeless and dire significance. This Court is convinced that respondent was in error in his interpretations, inferences, and deductions about the medical information, as follows: For the life tenant, the middle age problem was difficult and required treatments, which is not the situation in every instance as some *328 individuals experience little disturbance. However, that problem did not mean that the life tenant was an ill person. The extensive evidence relating to the treatments for the middle age problem shows that the cause of the menorrhagia was benign fibroid tumors, not myeloma, for which the treatments were curettage procedures and transfusion therapy to compensate for the blood loss which caused a secondary anemia. Those treatments were standard ones and were neither extreme nor radical. There is nothing in the record to the contrary. With respect to the transfusion therapy, there is nothing in the record to show that it was more than average; the attending physicians did not state to the contrary. Respondent did not go into that aspect on cross-examination. There were short hospital admissions in the summer of 1956, but they were only for the treatments of the menorrhagia, not for myeloma, and the doctors did not regard the treatments or hospital admissions as serious or different from standard procedures under the circumstances. Respondent's interpretations about the transfusion therapy are not correct. Rather, he has erred in regarding with alarm all that was done about, and even the *329 existence of, the middle age problem. To some laymen not acquainted with medical procedures, certain things receive undue emphasis and misinterpretation, such as hospital admissions, transfusion therapy (which is not uncommon), menorrhagia, benign fibroid tumors (which are a common occurrence), currettage procedures, and the like, none of which is necessarily a serious matter. The judgment of expert physicians about these things is a sounder guide than the interpretations of the inexperienced. The evidence shows (supp. tr., pp. 251-256) that this problem was kept under control, the attending doctors did not regard it with any alarm or as having serious implications. Dr. Howard Taylor's notes show that in September the problem was greatly improved, was believed to be satisfactorily and largely diminished, and that possible further procedures of a specific type were found to be unnecessary. Even though there was the problem of the middle age problem (the menopausal state), Dr. Watson found Elizabeth to be in good general condition in July 1956. The above observations are necessary. A distinction necessarily must be made between the chronic myeloma problem (diagnosed for the first time *330 in May and June 1956), and the middle age problem together with the treatments for that condition, because it is clear that respondent, under his theory, has confused, to a considerable extent, the latter with the former, especially with respect to the treatments given for the middle age problem. Those treatments, and the brief hospital admissions for them, were for the treatment of the menopausal problem, not for the myeloma. The life tenant was never hospitalized for myeloma. Furthermore, if the middle age problem had been the life tenant's only one, respondent, we are satisfied, would not advance the interpretations which he stresses. Respondent is confused and has confused the middle age problem and its treatments with the myeloma, thereby improperly attributing to the latter facts and aspects which were not attributed to the myeloma by the attending doctors of the life tenant. When this confusion in respondent's understanding was removed during the trial, much of respondent's theory was dissolved. We find that petitioner's contentions in the matter of the above-noted distinction are well supported by the evidence and are correct. The evidence as a whole about the second chronic *331 problem, myeloma (in and of itself), is that the competent physicians who were consulted and prescribed for it did not recommend, prior and up to September 17th, that there should be any treatment other than the taking of iron and liver, as before, because she was relatively asymptomatic as to it through September. This point is an important one which stands out sharply. It is clear from all of the evidence that the doctors' prescription of only liver and iron (ordinary treatment) for the life tenant's problem was consistent with and indicative of their appraisal that it was not an acute problem, that it did not require specific treatment. To prescribe liver and iron (just as before) instead of urethance or another established therapy for myeloma is practically tantamount to taking the view that no therapy at all was indicated or necessary for the myeloma. Yet, that was the view of the attending doctors, and there is nothing in the evidence to show that their view was not justified or was not the proper professional conclusion. Here, again, respondent appears to regard the clear evidence with some suspicion, but he did not even attempt to show that the appraisals and procedures of *332 the attending physicians were anything other than what the evidence shows. The evidence does not support respondent's contentions and theory about the chronic myeloma as of September 17, 1956. Upon consideration of the entire evidence, all of the medical testimony and exhibits, all of the medical opinions about the life tenant before and as of the date of petitioner's transfer of his contingent remainder, based upon all of the available information about the life tenant, the finding is made that no qualified physician, no one, could have foretold on September 17, 1956, the future duration of life of the life tenant, and that her life expectancy on that date was wholly unpredictable. [34]
*333 It is clear that under the rule of Ithaca Trust, in the determination of value on the date of the taxable act, hindsight is not to be applied. But respondent's agent, Chambers, frankly testified that he gave great weight to the date of the life tenant's death, as evidence of value, and analogized the date of death to the price at which closely held property is sold, such price in a closed transaction being evidence of value. This basic approach of respondent in this case is not in accord with the rule of Ithaca Trust. Moreover, it is not set forth in any ruling or regulation of the respondent which prescribes the method for valuing a future interest - a contingent remainder. On brief, respondent argues that on the date of the gift, the life tenant had an ascertainably short period of life expectancy and, therefore, the method of valuation prescribed in section 25.2512-5(e) of his regulations does not apply, but, rather, the method prescribed in section 25.2512-5(d) applies. He relies on the Jennings rule. Since the ultimate finding is that on the gift date, the life expectancy of the life tenant was indeterminate and could not be foretold, respondent's method of valuation falls. *334 On the evidence, this case is distinguishable from Jennings and the other cases in the Jennings group and the Jennings rule does not apply. [35]
Based upon all of *335 the evidence, we are convinced that petitioner's contingent remainder should be valued at the date of gift by using the actuarial method prescribed in section 25.2512-5(e) of the regulations. Actuarial experience is a criterion for valuing remainders as a means of dealing presently with the unpredictability of death. In this instance, departure from the method of valuation prescribed in section 25.2512-5(e) is neither justified nor required. Cf. Carl E. Weller, supra, p. 805, where the same conclusion was reached for gift tax purposes (under different circumstances); Estate of Irma E. Green, 22 T.C. 728, 731-732, 734; Estate of Millie Langley Wright, 43 B.T.A. 551, 555-556, where this Court rejected the contention that concealed and hidden facts were determinative of value and stressed the importance of taxpayers' being able to make intelligent approximations of their situations. Therefore, we have found as a fact that the value at the date of gift of the contingent remainder was $1,173,332.26, as computed by petitioner under section 25.2512-5(e). *336 The determination of life expectancy on the date of the taxable act is recognized as one where an estimate must be made and uncertain probabilities are dealt with. "The valuation of future interest is at best a highly speculative undertaking." Hipp v. United States, supra, p. 226. The value of a future interest cannot be determined exactly, or with certainty or perfection in an area ladened with uncertainty and speculation. McMurtry v. Commissioner, 203 F. 2d 659, 666. The word value, as used in the statute, with respect to the value of a future, contingent remainder and a life tenant's life expectancy, depends on prophecies of the future that are more or less certain. Ithaca Trust. And here, the evidence shows that the life expectancy of the life tenant which enters into the determination of the present value of the contingent remainder could not be prophesied with certainty. The use of mortality and actuarial tables in valuing a future interest dependent upon a life estate involves the use of established computations which seldom accurately predict the *337 future in a particular situation or accurately determine value in a particular case, but the use of such established computations proves to be substantially correct when used in a great number of instances under the law of averages; and the respondent's position is that he deals with a great enough number of different taxpayers to eventually receive the benefit of the process of averages. Hipp v. United States, supra; McMurtry v. Commissioner, supra; Gelb v. Commissioner, 298 F. 2d 544, 551-552. The actuarial method of valuing interests in property is of widespread and longstanding use in Federal and state jurisdictions. In this case, respondent's determination was little better than a guess which cannot be approved. Under all of the evidence, the use of the valuation method prescribed by section 25.2512-5(e) of the regulations by the petitioner is sustained. There is no issue for decision about petitioner's gift tax liability for 1957; it depends upon the decision of the issue considered here, and no recomputations are required. Decision will be entered for the petitioner. Footnotes
1. See sections 86.19(f) and 4(g) of Gift Tax Regulations 108 under the 1939 Code, pp. 33 and 34. See, also, T.D. 6091, 1954-2 C.B. 47↩, which made Regs, 108 applicable under the 1954 Code, pending the issuance of the Gift Tax Regulations under the 1954 Code which later were approved on November 10, 1958, and superseded Regs. 108. The Gift Tax Regulations under the 1954 Code apply to gifts made in 1955 and subsequent years.
2. Petitioner contends that as a matter of law, evidence about Elizabeth's health on the date of gift is irrelevant and immaterial because section 25.2512-5(e) of the Gift Tax Regulations prescribes the method for valuing the contingent remainder for the purpose of the gift tax. In addition, the legal representatives of the estate of Elizabeth Stillman Williams, i.e., her executors, did not give their consent to the introduction into the record of this case of such evidence as is within the physician-patient privilege contained in section 14-308 of the District of Columbia Code, and they asserted the privilege and objected to the receipt in evidence of such evidence on the ground of privilege. By separate order of this Court, the objection was overruled. Buckminster's Estate v. Commissioner, 147 F. 2d 331↩ (C.A. 2, 1954).
3. Exhibit M.↩
4. In exhibit D-1, excerpts from Maxwell M. Wintrobe, "Clinical Hematology," p. 1077, dealing with diagnosis, the author states that the finding of plasma cells in the bone marrow is not of itself evidence of the presence of multiple myeloma, and that the presence of such cells has been found in several disorders, including rheumatold arthritis, and various "collagen disorders." ↩
5. Exhibit M. notes made on July 9, 1956, "Recommendations." ↩
6. Supplemental transcript, p. 226, 227.↩
7. Supplemental transcript, pp. 267, 268.↩
8. Supplemental transcript, pp. 44-47; 78-79; 297-299; exhibit D, p. 4.↩
9. There are a substantial amount of testimony and many exhibits dealing with multiple myeloma, in general. ↩
10. Exhibit 9; exhibit D-1, p. 1077; supplemental transcript pp. 215, 219-221, Dr. Osserman. ↩
11. Exhibit D-2, p. 13; exhibit 9, p. 4. ↩
12. Supplemental transcript, p. 222, Dr. Osserman; exhibit 9, exhibits D-3, D-5, D-6.↩
13. Supplemental transcript, pp. 97-99, Dr. Reznikoff. ↩
14. Supplemental transcript, pp. 97-99, Dr. Reznikoff; pp. 219-221, Dr. Osserman. ↩
15. Supplemental transcript, pp. 223-224, Dr. Osserman.↩
16. Supplemental transcript, p. 230, Dr. Osserman.↩
17. As of July 9, 1956, and up to and including September 17, 1956, no doctor believed that the use of any of these well established therapies was required in Elizabeth's condition and none was recommended. Dr. Watson in his report referred to them but concluded that such specific treatment was not then necessary. Exhibit M. ↩
18. Supplemental transcript, pp. 222-233, Dr. Osserman; and exhibit 10.↩
19. Supplemental transcript, pp. 223, 230-231, Dr. Osserman. ↩
20. The evidence includes several exhibits and charts showing the effects of therapies and resulting remissions which include radiotherapy, urethane therapy, and melphalan therapy. See exhibit 10, for example. ↩
21. Exhibit D-5, p. 882; Carson, "Radiation in Plasma Cell Myeloma." ↩
22. Exhibit D-6, "The Medical Clinics of North America, Mayo Clinic Number, p. 1171. ↩
23. Exhibit D-3, pp. 310-314, Case 13.↩
24. Supplemental transcript, pp. 257-260, Dr. Osserman.↩
25. Supplemental transcript, pp. 249-250; exhibit 10, Dr. Osserman. See, also, pp. 228-250.↩
26. Supplemental transcript, p. 108, Dr. Reznikoff; exhibit D-1, p. 1077-1078; supp. tr., p. 113, p. 121. ↩
27. Supplemental transcript, p. 242, p. 286, Dr. Osserman.↩
28. Supplemental transcript, p. 124, Dr. Reznikoff. ↩
29. Supplemental transcript, p. 73.↩
30. Section 25.2512-5: * * * (d) Remainders or reversionary interests. - If the interest to be valued is a remainder or reversionary interest subject to a life estate, the value of the interest should be obtained by multiplying the value of the property at the date of the gift by the figure in column 4 of Table I opposite the number of years nearest the age of the life tenant. If the remainder or reversion is to take effect at the end of a term of years, column 4 of Table II should be used. * * *↩
31. Section 25.2512-5: * * * (e) Actuarial computations by the Internal Revenue Service. - If the interest to be valued is dependent upon the continuation or termination of more than one life, or there is a term certain concurrent with one or more lives, or if the retained interest of the donor is conditioned upon survivorship, a special factor is necessary. The factor is to be computed upon the basis of the Makehamized mortality table appearing as Table 38 of United States Life Table and Actuarial Tables 1939-1941, published by the United States Department of Commerce, Bureau of the Census, and interest at the rate of 3 1/2 percent a year, compounded annually. Many such factors may be found in, or readily computed with the use of the tables contained in, a pamphlet entitled "Actuarial Values for Estate and Gift Tax." This pamphlet may be purchased from the Superintendent of Documents, United States Government Printing Office, Washington 25, D.C. However, if a special factor is required in the case of an actual gift, the Commissioner will furnish the factor to the donor upon request. The request must be accompanied by a statement of the date of birth of each person, the duration of whose life may affect the value of the interest, and by copies of the relevant instruments.↩
32. The executors of the estate of Elizabeth Stillman Williams appeared at the beginning of the trial of this case, through their counsel, David G. Bress, and asserted the privilege under section 14.308 of the D.C. Code, stated that they did not waive the privilege, and immediately and continuously objected to the admission in evidence of any of the medical records and evidence relating to Elizabeth, and they filed briefs. During adjournment of the trial, the objection was considered by the Court and the ruling was made under an order that a co-executor had impliedly waived the privilege prior to the trial, Buckminster's Estate v. Commissioner, 147 F. 2d 331, 335↩, and the objections based on the privilege were overruled and medical evidence was admitted.
33. Ithaca Trust was presented under stipulated facts in the Court of Claims, 64 Ct. Cl. 686↩, where the question of the valuation of the charitable remainder was not reached because it was held that the testator's charitable bequests were too contingent and uncertain to permit deduction for them in computing the amount of the estate for estate tax. The Supreme Court reversed that holding, thereby reaching the question of valuation. The facts were: Edwin C. Stewart died June 15, 1921, survived by his widow, Annie. The estate tax return was filed on June 14, 1922. Annie died on December 12, 1921. There were no facts about the cause of her death and no question about that. She was the life tenant of the residuary estate. During 6 months, income of the estate, $10,110.04, was applied for her maintenance. As of the date of the filing of the estate tax return, therefore, it was known that the amount of the charitable remainders had been diminished by only the above amount. Nevertheless, the Supreme Court held that the value of the life estate on the date of the testator's death must be estimated by the mortality tables, i.e., by using the actuarial method of valuing the remainders prescribed in the Commissioner's applicable regulation.
34. The problem here is one of evidence. The evidence establishes that on September 17, 1956, the life tenant's future duration of life was incalculable, as opposed to respondent's contention that it could be determined with a degree of exactitude. The following observation is an appropriate one here, by Gilbert K. Chesterton, in "Orthodoxy": The real trouble with this word of ours is not that it is an unreasonable world, nor even that it is a reasonable one. The commonest kind of trouble is that it is nearly reasonable, but not quite. Life is not an illogicality; yet it is a trap for logicians. It looks just a little more mathematical and regular than it is; its exactitude is hidden; its wildness lies in wait. It is this silent swerving from accuracy by an inch that is the uncanny element in everything. It seems a sort of secret treason in the universe. An apple or an orange is round enough to get itself called round, and yet is not round after all…. A blade of grass is called after the blade of a sword, because it comes to a point, but it doesn't. Everywhere in things there is this element of the quiet and incalculable.↩
35. Petitioner argues that since respondent has never promulgated a ruling or amendment to section 25.2512-5(e) adopting the Jennings rule (applied by this Court in only the four cited Jennings group of cases and a few others decided under memorandum opinions), he has been caught in a "tax trap" due to his belief that he had, at the time he decided to make the transfer of his remainder, a right to rely on section 25.2512-5(e), the regulation which prima facie is applicable. It is correct, as petitioner points out, that this is the first instance where the respondent has applied the Jennings rule in determining the value of a contingent remainder for either the gift or estate tax, the taxpayers having been previously the parties who contended that departure from the method prescribed in subparagraph (e) is permissible. (However, in Carl E. Weller, supra↩, involving another kind of interest, respondent departed from the regulation which prima facie was applicable, but this Court reversed the respondent.)